MAYOR AND CITY COUNCIL OF BALTIMORE,
ET AL. *v.* LANDAY, ET UX.

[No. 136, September Term, 1969.]

*Decided July 7, 1970.*

The cause was argued before HAMMOND, C. J., and MC-WILLIAMS, FINAN, SINGLEY, SMITH and DIGGES, JJ.

*Howard E. Wallin, Assistant City Solicitor, Richard K. Jacobsen, Assistant City Solicitor,* and *James B. Murphy, Special Assistant City Solicitor,* with whom were *George L. Russell, Jr., City Solicitor,* and *Ambrose T. Hartman, Deputy City Solicitor,* on the brief, for appellant Mayor and City Council of Baltimore.

*Harry S. Shapiro, Assistant County Solicitor,* with whom was *R. Bruce Alderman, County Solicitor,* on the brief, for appellant Baltimore County, Maryland.

*Charles C. W. Atwater,* with whom were *Mylander & Atwater* on the brief, for appellees.

HAMMOND, C. J., delivered the opinion of the Court.

In 1941 Albert Landay and Cele Landay, his wife, the appellees, bought some fifteen acres of low land south of Pulaski Highway running from North Point Road to Herring Run. Over the years, they filled much of the land and caused it to be improved by a number of buildings which they rented to trucking firms and for other commercial uses at substantial rentals. From time to time during these years Herring Run overflowed causing damages to land and buildings of the Landays (resulting from decreased rentals and clean-up and repair expenses) estimated by them to be some $300,000. In 1956 they filed a bill of complaint in the Circuit Court of Baltimore City against the Mayor and City Council of Baltimore (City) and the County Commissioners of Baltimore County (County) which, as subsequently amended, alleged that

Herring Run begins in Baltimore County, runs through the City and then back into the County to empty into Moore's Run and Back River, that City and County each had adopted Herring Run as part of its storm drainage system, thus canalizing large additional quantities of water into the stream, that both City and County had failed to adapt the Run to its new and greater responsibilities and as a consequence the stream had become clogged with silt and debris and was thereby caused to flood the Landay property when the rains came.

The prayers for relief were that City and County be enjoined from depositing on the property water which had not formerly flowed over it, or, alternatively, that City and County be required to control and maintain Herring Run as part of their respective storm water systems so as to provide adequate and contained passage of water each had concentrated, without damage to private property.

Various and elaborate discovery proceedings were had by the Landays, the City and the County. On October 26, 1960, the parties executed a settlement agreement (the contract) under which the City and the County denied that they were legally liable either for past damages or to prevent future flooding, and the parties agreed that the execution of the settlement agreement would not constitute an admission of liability by City or County in the past or in the future. It was then recited that:

> "Whereas, the City and County have agreed to undertake certain work which is hereinafter set forth in this Agreement, and in consideration of such undertaking by the City and the County, the Landays have agreed to dismiss the above described proceedings which are pending in the Circuit Court of Baltimore City and to release the Defendants from all claims therein made for damages, as is hereinafter more specifically set forth."

The County promised that within twenty days it would

commence to clear and grub the bed of Herring Run from the City-County line to the confluence of the Run and Moore's Run, the work to be completed as expeditiously as possible.

Simultaneously, a pilot channel with a bottom width of twenty-five feet would be excavated and constructed along the same route and completed within six months. The County further promised that starting at once it would proceed to acquire, by negotiation if possible, the necessary rights-of-way for a permanent channel (the width, depth and shape specified in detail) from the City-County line to the confluence of Herring Run and Moore's Run, and:

> "If the County has not acquired by negotiation the necessary rights-of-way for said channel within three (3) months after the execution of this Agreement, the County will then immediately institute condemnation proceedings and will prosecute the same diligently in order to acquire said rights-of-way as expeditiously as possible until all of such necessary rights-of-way are acquired. * * * The County covenants and agrees that all work described in this paragraph shall be completed by the County within nine (9) months after all necessary rights-of-way for the said channel have been finally acquired."

The City promised to construct forthwith a pilot channel twenty-five feet wide from a named critical point to the City-County line, it being agreed that the pilot channel "shall be constructed in cooperation with and as nearly simultaneously as possible with the construction of the pilot channel by Baltimore County * * *," and that the pilot channel would be completed within seven months.

The City also agreed to proceed to acquire by negotiation, if possible, the necessary rights-of-way for a permanent channel (described in specific detail) and if it did not acquire them within three months after the date of the agreement:

"the City will then immediately institute condemnation proceedings and will prosecute the same diligently in order to acquire said rights-of-way as expeditiously as possible until all necessary rights-of-way are acquired. * * * The City agrees that the construction of the permanent channel shall proceed as rapidly as possible and is intended to be performed as nearly as possible in coordination with the construction of the permanent channel by the County, as otherwise provided in this Agreement, and said construction by the City shall be completed no later than eleven (11) months after all necessary rights-of-way for said channel have been finally acquired by the City."

City and County both agreed:

"that they will within their respective jurisdictions exert their best efforts to maintain a stream bed level in the permanent channel provided for in this Agreement with the elevations not more than one (1) foot higher than those set forth in this Agreement and with an effective width approximately the same as is provided in this Agreement."

The Landays executed an order of dismissal as to the City and an order of dismissal as to the County and delivered one to counsel for the City and one to counsel for the County "as independent escrow agents." The orders were to be filed in the proceeding when the work was substantially completed as agreed upon and then were to operate as a release of all claims for prior damages.

It was further agreed that if the work required "is not performed by the times specified herein," the orders of dismissal should not operate as releases.

Performance by the City and the County was uneven for a time. The City was prompt in constructing the pilot channel, the County was not, and the blockage downstream in the County largely nullified the benefit of the

City's work. If no condemnation proceedings were necessary, the City had fourteen months—until December 26, 1961—and the County twelve months—until October 26, 1961—to fulfill their respective obligations to construct a permanent channel, and neither met that obligation on time.

On December 29, 1961, the Landays filed a supplemental bill alleging that neither the City nor the County had acquired the necessary rights-of-way, neither had instituted any condemnation proceeding, that the Landay property had been damaged as a result of flooding on several occasions since the execution of the agreement of October 26, 1960, and that they were entitled to "monetary compensation for said damages which have accrued and which may hereafter accrue prior to the date of a decree to be entered herein." There followed this language:

> "The said Agreement of October 26, 1960, specified in detail the nature and extent of the work to be performed by Baltimore City and Baltimore County to the end that Herring Run should be properly maintained and controlled, such as the width, elevation, location, and type of construction of the new bed of the stream, which details were agreed upon by the Complainants and the Defendants after lengthy studies by experts employed by each and numerous conferences attended by counsel and engineers employed by the Complainants and the Defendants; the Complainants are advised and believe that the work so specified is necessary and proper to provide an adequate storm water sewer to carry the waters flowing in Herring Run to its confluence with Back River and thereby prevent further damage to the property of the Complainants.
>
> "Wherefore, the Complainants pray that this Honorable Court may by its Decree:

"(a) Order the specific performance by the Mayor and City Council of Baltimore and by Baltimore County, Maryland of the covenants and agreements on their part to be performed pursuant to the said contract entered into between the Complainants and the Defendants dated October 26, 1960.

"(b) Or, in the alternative, require the Defendants, Mayor and City Council of Baltimore, and Baltimore County, Maryland, properly to control and maintain Herring Run as part of the storm water system of said City and of said County so as to prevent the creation of a nuisance and to prevent damage to private property and to provide by adequate means for passing off the water concentrated and collected by said City and said County.

"(c) Award to the Complainants reasonable damages to compensate them for the damage they have suffered as the result of the failure of the Defendants to perform the covenants and agreements on their part agreed to be performed by the said Agreement of October 26, 1960.

"(d) Award to the Complainants reasonable damages to compensate them for the injury and damage they have suffered as the result of the wrongful action of the Defendants in failing to perform their obligations to provide a proper storm water system and in causing the said injury and damage to the Complainants' property."

The City on January 30, 1961, had caused to be introduced in the Council an ordinance authorizing condemnation of lands needed for the project and this was passed and approved the following June 30. On September 7 the first rights-of-way were acquired by the City. On December 8 it filed the first (and only) condemnation suit. On May 17, 1962, it acquired the last necessary right-of-way

and all the work agreed to be done was completed on November 6, 1962, at a cost to the City of $720,000.

The County was some fifteen months late in instituting its first condemnation suit, which it filed in April 1962. It awarded the contract for its part of the work on the permanent channel on April 3, 1962, and work was commenced on June 27. All of its part of the work also was fully done by November 6, 1962, at a cost to the County of $200,000.

City and County requested a separate trial on the issue of whether or not they had breached the agreement, and this came before Judge Cullen on September 18, 1962. On November 29, 1963, a year after the permanent channel had been fully completed as agreed upon, Judge Cullen decreed that City and County had not literally complied with the time schedules set out in the agreement, that this was an entire breach, that the Landays had not waived the breach and that the case should go to trial on the merits. An appeal to this Court was dismissed as interlocutory, and so premature.

Trial on all issues began on May 12, 1964, and continued with various interruptions until September 1965. Judge Barnes, who heard the merits, took 915 pages of trial notes on the 42 days he heard testimony that now occupies some 250 printed pages of the record extract, and considered some 750 exhibits. In an able opinion that carefully and exhaustively considered the many questions presented to him, he held that City and County by various negligent acts or omissions had caused or materially contributed to the floodings that had harmed the Landays' properties and must respond in damages, that the Landays were not barred from recovery because of any negligent acts that had contributed to the flooding, and that the Landays had not waived the defaults in the time provisions or other parts of the settlement agreement of October 26, 1960. On January 10, 1967, Judge Barnes decreed that City and County should pay the Landays monetary damages in the amount of $107,575.49 and that the Court would retain jurisdiction "to insure proper main-

tenance by [the City] and [the County] of their respective portions of the channel improvements in Herring Run as part of their respective storm water systems." The appeals here are from the interlocutory order of November 29, 1963, and the final decree of January 10, 1967.

In the posture in which the case reaches us, we see the only question to be decided is whether the Landays are entitled to the damages they had agreed in the contract to release. We regard Judge Barnes' finding that City and County had incorporated Herring Run in their respective storm water drainage systems as fully justified by the evidence, and we agree with his findings that prior to the contract each had failed in its obligations to see that Herring Run was unobstructed, clean and large enough to carry off the water each had canalized into it. There can be no doubt that City and County did not act with the chronological precision set out in the contract, and there also can be no real doubt that if this renewed their liability to the Landays for damages which they agreed to waive, the damages found by the chancellor were supported by the evidence.

Judge Barnes rejected the contention that the Landays must accept the contractually agreed to performance by City and County of their obligation to reconstruct Herring Run, even though ten months late, and that this acceptance bars them from the damages they had foregone in exchange for that reconstruction, saying:

"Judge Cullen, quite properly, the Court thinks, found that the provisions of the Agreement in regard to time were unambiguous, of the essence in the contract and that the breach by the City and County of the time provision entitled the [Landays] to withdraw their orders of dismissal placed in escrow when the Agreement was signed. As the City and County were already legally obligated to make the improvements necessary to prevent the recurring flooding on the subject property, the *only legal consideration*

258 Md.—19

for dismissing the pending suit was the time provision. * * * Mr. Landay no doubt thought that it was good business to give up his damage claim if the City and County would follow the time schedule set out in the Agreement, thereby enabling him to reassure his tenants that their deliverance was near and thus keep the existing tenants paying their rentals."

We do not agree. The record leaves no doubt that the Landays' paramount and primary interest and endeavor always have been to have Herring Run rebuilt so that a completely adequate and permanent solution of the flooding problem would be effectuated. Damages for past floodings always have been secondary. The contract did not expressly make time of the essence and we think it was not intended that it should be. It could not be foreseen when the contract was executed how many condemnation suits would have to be filed or how long it would take to file them and, in the County, which at first had no "quick-take" powers, how many would have to be tried or how long it would take to try them. The day when all necessary rights-of-way had been secured by both City and County could well have been long after November 6, 1962, when all the work was finished, and had all work thereafter been expeditiously accomplished the Landays would have had no claim to past damages.

The following of the precise time schedule was not the only consideration flowing to the Landays. First, at the time of the contract, there was an honest dispute between the parties both as to liability and amount on the Landays' claim. "It is well established that forbearance to sue for a lawful claim and demand is good consideration * * *." *Board of Co. Comm'rs v. MacPhail,* 214 Md. 192, 197-198. Second, there were other considerations present. The Landays employed (as they themselves said, at great expense) an expert of very high competence, wisdom and extensive experience.[1] City and County accepted his find-

1. Judge Barnes said of this expert: "The Court was most

ings and recommendations and agreed to rebuild (and did rebuild) Herring Run as he said it should be rebuilt to insure no further flooding. That this would be done in such fashion was a valuable consideration to the Landays. Another valuable consideration was that City and County would coordinate their discharge of their joint responsibility and work as one in making Herring Run an effective storm drain. A third additional valuable consideration was that City and County would maintain Herring Run essentially as it had been rebuilt to the expert's specifications. We think City and County had a reasonable time to complete what they agreed to do, that they acted in good faith to finish the job as soon as—since large bodies, particularly large governmental bodies, move slowly —they reasonably could, and that the Landays got exactly what they had been demanding for years, as nearly as reasonably possible, albeit some months later than they had hoped. *Cf. Chapman v. Thomas*, 211 Md. 102.

If it be assumed that the failure to follow precisely the time schedule in the contract was a breach by City and County that could have entitled the Landays to disavow the contract and claim damages for the breach, they are not helped, as we see the matter. In their supplemental bill the Landays again showed their paramount and primary interest in having Herring Run made an effective storm drain. Their first prayer for relief was for specific performance of the contract (which meant that the work would be done as their expert said it should be and not only constructed but maintained by City and County working together), and their third prayer was for damages suffered because of the delay in performing. The second ("or in the alternative") prayer was essentially that used in the original bill, that the court require the City and the County "properly to control and maintain Herring Run as part of the storm water system of said

favorably impressed with Mr. [Benjamin E.] Beavin as a witness, finding him to be well qualified, objective and forthright in his testimony. There is no question in regard to his integrity and the high regard in which he is held in his profession. The Court accepts his testimony and conclusions as accurate."

City and of said County * * *," and the fourth prayer asked for damages, not for breach, but for failure to have discharged the general duty not to cause flooding.

The Landays had the alternative of accepting the breach and seeking to compel performance of the original duty of City and County and damages for non-performance of this duty. Another alternative was to compel specific performance and the award of damages accruing because of delay in performance. They could gain enjoyment of the rights accruing under either alternative but not of the rights accruing under both. In the situation before us, as generally, one cannot approbate and reprobate. 2 Restatement *Contracts* § 417:

"An Accord: Its Effect When Performed and When Broken.

"* * * the following rules are applicable to a contract to accept in the future a stated performance in satisfaction of an existing contractual duty, or a duty to make compensation."

Subsection c states:

"If the debtor breaks such a contract the creditor has alternative rights. He can enforce either the original duty or the subsequent contract."

It is clear that the Landays could claim alternatively in the same suit but that they finally must elect which alternative they would use and accept, and that a judgment reflecting that election would bar recovery under the other theory. *Pemrock, Inc. v. Essco Co.,* 252 Md. 374, 379, reiterates the law of Maryland on the subject:

"The Maryland Rules ease the fear of inconsistency that was said to be the hobgoblin of little minds and permit the pleading of alternative inconsistent claims. Rule 313 a permits a plaintiff to join in one action either as independent or alternative claims as many claims as he may have against a defendant, and Rule 313

c provides that where the plaintiff is uncertain against which of several persons he is entitled to relief, he may join any or all of them as defendants in the alternative, although the claim or right to relief against one may be inconsistent with the claim or right to relief against the other. Rule 301 d provides that a party in the action may plead in answer to any pleading cumulatively or in the alternative as many matters as he may deem necessary regardless of consistency. * * *

"The cases have said that if one claim or remedy is pursued to judgment an inconsistent claim is thereafter barred. *Bolton Mines Co. v. Stokes*, 82 Md. 50; *Kirchner v. Allied Contractors, Inc.*, 213 Md. 31; *Travelers Indemnity Co. v. Nationwide Construction Corporation*, 244 Md. 401, 416. The theory of the Maryland statements seems to have been that the plaintiff may not again vex the same defendant if he has already taken judgment against him for the same wrong. *Hamlin Mach. Co. v. Holtite*, 197 Md. 148."

See also *State Roads Commission v. Smith*, 224 Md. 537, 543.

The doctrine is equitable in nature and it is not surprising that after breach of a contract it is not only a judgment evidencing the right to one kind of satisfaction that estops the claimant from receiving another kind, it is also any such advantage received by the claimant under one theory as makes it inequitable for him to receive relief under the other theory. See Restatement *Contracts* §§ 309 and 382. See also *Hamlin Machine Co. v. Holtite Mfg. Co.*, 197 Md. 148, 159. See 5 *Williston on Contracts* (3rd Ed.), § 687, wherein it is said:

"The commonest case of election in the law of contracts arises where, with knowledge of a breach of condition or a defense excusing per-

formance, a promisor either refuses or continues to accept performance by the other party. As the only theory upon which the benefit of such performance can be rightfully received is on the assumption of an election to continue the contract, that assumption is made if the injured party accepts further performance."

In the following section (p. 300) the author continues this exposition:

"The principle is general that wherever a contract not already fully performed on either side is continued in spite of a known excuse, the defense thereupon is lost and the injured party is himself liable if he subsequently fails to perform, unless the right to retain the excuse is not only asserted but assented to."

In accord is 3A *Corbin on Contracts* § 755.

In *John B. Robeson Associates, Inc. v. Gardens of Faith, Inc.*, 226 Md. 215, 222-223, Judge Prescott (later Chief Judge), relying on the cited authorities, said for the Court:

"There are few principles of contract law better established, or more uniformly acknowledged, than that a party to an executory bilateral contract, who keeps the same in existence after a known breach by the other party and accepts further performance from the party who has committed the breach, waives the breach, in the absence of an assertion of his intention to retain the rights accruing to him as a result of said breach, assented to by the other party; and if the injured party thereafter does not make good his promises of performance, he is responsible for such failure. * * *
* * *

"The above authorities have been specifically cited, with approval, by this Court in *Nat.*

*School Studios v. Mealey,* 211 Md. 116, 126 A.2d 588, *Nichols v. Nicholas,* 217 Md. 79, 141 A.2d 746, and *Gould v. Transamerican Associates,* 224 Md. 285, 167 A.2d 905; and they correctly expound the law of this State."

See too *Pumphrey v. Pelton,* 250 Md. 662, and *Mascaro v. Snelling and Snelling,* 250 Md. 215, 235; and 25 Am. Jur. 2d, *Election of Remedies,* § 18, p. 661, and § 20. In 5A *Corbin on Contracts,* § 1220, p. 469, the author says:

"The basis for an estoppel may be made out not merely because of a change of position made by the defendant in reliance on the plaintiff's election, but also in some cases by reason of the effect of the plaintiff's own conduct. The form of the procedure invoked by him may be such as to make it unjust thereafter to harass the defendant in a different manner."

In Note 40 on the same page Professor Corbin states: "The acceptance of a settlement or of any substantial advantage, under and by virtue of a claim of one alternative remedy, will bar a subsequent claim to a different remedy." This rule finds support in the reasoning and holding of *Travelers Indemnity Co. v. Nationwide Constr. Corp.,* 244 Md. 401, 413-418, in which Judge Oppenheimer for the Court lucidly and soundly discussed and applied the doctrine of estoppel in the area of election of remedies. Similar statements are found in *McMahan v. McMahon* (S. C.), 115 S. E. 293, 295; *Abdallah v. Abdallah* (3rd Cir.), 359 F. 2d 170, 175; and *Pemberton v. Ladue Realty & Constr. Co.* (Mo.), 224 S.W.2d 383, 385. See also *Frumin v. Chazen* (Tenn.), 282 S. W. 199, and *Kingsbery v. Phillips Petroleum Co.* (Tex. Ct. Civ. App.), 315 S.W.2d 561, 567.

In the case before us the reconstruction of Herring Run had been finally finished on November 6, 1962, over a year before Judge Cullen ruled and some eighteen months before the case went to trial on all issues before Judge

Barnes. It had proved effective and, concededly, had added some $250,000 to the value of the Landay property. It had been constructed exactly according to the plan and requirements of the contract, which were the plan and requirements of the Landay expert. The Landays' prayer for specific performance had been granted and executed, not by the court but by City and County, and the Landays when they went to trial had precisely and exactly what they would have had if the chancellor had decreed specific performance, only much sooner. Judge Barnes found in his opinion, in discussing what relief should be granted: "It is clear, of course, that the channel improvements having already been made, there is no necessity for a negative or mandatory injunction in the suit."

If specific performance had been decreed, damages accruing prior to suit could not have been awarded. The Landays got earlier specific performance without a decree. Mr. Bumble would be right and the law would be a ass if in these circumstances the effect and result of the non-formalized specific performance are not those that would have followed a decree for that relief, and we hold that they are.

Leading to the same conclusion are the facts that the Landays over the period from December 29, 1961, when they filed the supplemental bill, to November 6, 1962, when the rebuilding of Herring Run was fully and satisfactorily completed, saw City and County working day by day pursuant to the contract, saw the workers day by day adding valuable benefits to their land in the fashion the contract said they should and sat silently by accepting the benefits they had asked the court to require City and County to bestow upon them. The Landays by their prayers for relief based on disavowal of the contract may be deemed to have asserted a potential intention to retain the rights accruing to them as a result of the breach of the contract, despite performance thereafter by City and County, but City and County had not consented to this retention, *John B. Robeson Associates, Inc. v. Gardens of Faith, Inc., supra.*

In those circumstances a judgment was not needed to effect an estoppel; the silent acceptance of the value added to their lands day by day and of the ultimate benefits of the finished work was enough, 5 *Williston on Contracts* says in § 688, p. 303, cited earlier:

> "Even silence when it is likely to mislead the other party and induce him to believe that further performance of the contract will be accepted may amount to an election. 'He who is silent when he ought to have spoken, will not be heard to speak when he ought to be silent,'"

citing *National School Studios, Inc. v. Mealey*, 211 Md. 116, quoting *Jaworski v. Jaworski*, 202 Md. 1, and *Burke v. Burke*, 204 Md. 637. To this may be added *Bean v. Steuart Petroleum Co.*, 244 Md. 459.

The Landays prayed for damages resulting from delay in performance and they are entitled to a decree for those they can prove. *Miller v. Talbott*, 239 Md. 382, 391, *et seq.*

The decree of November 29, 1963, and paragraph 1 of the decree of January 10, 1967 (which awarded monetary damages) will be reversed. Paragraph 2, awarding costs below, and paragraph 3, retaining jurisdiction, of the decree of January 10, 1967, will be affirmed.

> *Decree of November 29, 1963, reversed; decree of January 10, 1967, reversed in part and affirmed in part, and case remanded for determination of damages suffered by appellees by reason of delay in the completion of the contract of October 26, 1960; three-fourths of the costs in this court to be paid by Mayor and City Council of Baltimore and one-fourth by Baltimore County.*