530 A.2d 1

**FIDELITY DEPOSIT COMPANY OF MARYLAND, et al.**

v.

**OLNEY ASSOCIATES, INC.**

No. 1428, Sept. Term, 1986.

Court of Special Appeals of Maryland.

Sept. 3, 1987.

William B. Spellbring, Jr. (O'Malley, Miles, McCarthy & Harrell, on the brief), Upper Marlboro, for appellants.

Stanley R. Jacobs, Rockville, for appellee.

Argued before MOYLAN and WEANT, JJ., and JAMES S. GETTY, Associate Judge of the Court of Special Appeals (retired), Specially Assigned.

JAMES S. GETTY, Judge.

William L. Griffith and Company, Inc., (Griffith) and Fidelity Deposit Company of Maryland (Fidelity) have appealed from a judgment entered in favor of Olney Associates, Inc., (Olney) following a jury trial in the Circuit Court for Montgomery County. Olney has filed a cross-appeal alleging that the trial judge (Beard, J., presiding) erred in granting partial summary judgment to the appellants thereby restricting the damages claimed by Olney. The case was a contract action arising from a one count declaration filed on July 28, 1984, by Olney against Fidelity and Griffith.

*Facts*

On September 1, 1982, Olney entered into a written contract with Griffith for construction of 34 office units in Montgomery County, Maryland. Fidelity furnished a performance bond and a labor and material payment bond. The contract dated September 1, 1982, contained a provision for damages for delay in performance of $400 per day commencing on April 1, 1983.

A dispute arose between Olney and Griffith when Olney refused to pay Griffith any further money until the job was completed. On November 16, 1983, Griffith filed an action to enforce a mechanic's lien claim and a separate action to enjoin occupancy; on June 28, 1984, Olney sued Griffith and Fidelity on a breach of contract theory.

In February of 1984, Olney and Griffith entered into a subsequent agreement to settle the litigation. Although Fidelity was not a party thereto, the agreement nonetheless provided that it was not the intent of the parties to release Fidelity from its liability. Pursuant to the terms of the February agreement, Olney agreed to pay Griffith upon execution of the agreement the sum of $108,375.00 and Griffith agreed to complete the items remaining on a punch list.[1] The sum of $10,000.00 of the total amount due Griffith was placed in escrow by agreement of the parties to be released upon certification by an engineering firm selected by the parties that the work had been completed.

The record indicates that after receiving the $98,375.00 Griffith did not complete the work or request a final inspection to obtain release of the $10,000.00 held in escrow. At the conclusion of the trial, the jury returned a verdict in favor of Olney against both Griffith & Fidelity in the sum

---

1. A "punch list" is a final listing of small items requiring completion, or finishing, corrective or remedial work under a construction contract. *Viking Builders, Inc. v. Felices,* 391 So.2d 302, 303 (1980). It is clear from the record that the cost of completing the punch list items was substantially higher than the $10,000.00 held in escrow, and it is also clear that included in the $98,375.00 payment were items that had not been completed and were included on the punch list.

of $71,850.33, representing the cost of completing the project. Not submitted to the jury was whether Olney was entitled to damages for delay pursuant to the terms of the original contract dated September 1, 1982, which involved an additional claim for $55,600.00, and whether Olney was entitled to an additional $49,192.08 for units it was unable to sell because of construction problems, mainly water damage.

 Prior to trial, Griffith and Fidelity filed a motion for partial summary judgment seeking to limit Olney's claim to the cost of completion of the project in accordance with the terms of the substituted agreement. The trial court (Messite, J.) granted the motion as to Griffith, but denied it as to Fidelity. Thus, the case proceeded to trial on Olney's claim against Griffith for failure to complete construction and against Fidelity for both failure to complete the project and for damages for delay under the original contract.[2] Prior to submission of the case to the jury, Fidelity's motion for partial summary judgment was renewed and granted by the trial court. Olney, therefore, was precluded from seeking delay damages provided for in

---

2. From the record we assume that the denial of the motion for partial summary judgment as to Fidelity before trial was based upon the settlement agreement wherein Olney and Griffith stated it was not their intention to release Fidelity. Ordinarily, the release of the principal discharges the surety. See *Noma Electric Corp. v. Fidelity Deposit Co. of Maryland,* 201 Md. 407, 94 A.2d 277 (1953); *Prodis v. Constantinides,* 167 Md. 33, 172 A. 286 (1934). We note that where, without the surety's consent, the principal and creditor modify their contract, otherwise than by extension of time of payment, a compensated surety is discharged if the modification materially increases his risk, but is not discharged if the risk is not materially increased but his obligation is reduced to the extent of loss due to the modification. Restatement, *Security,* ch. 5, sec. 128.

We need not decide whether Fidelity was discharged by the substituted contract for several reasons. First, Fidelity did not raise the issue of discharge from the substituted contract. Its motion for partial summary judgment addressed only the issue of liability for delay under the original contract. The trial judge properly granted that motion before submitting the case to the jury. Second, Fidelity's risk under the substituted contract was reduced since the only issue before the jury was the cost of completion of the punch list.

the original contract. Recovery was limited to the cost of completion of construction, i.e., the punch list attached to the substituted contract. The jury determined these costs to be $71,850.33 and judgment was entered for that amount. Appellants' motion for new trial and remittitur was denied.

On appeal, appellants allege that the following evidence should not have been admitted:

1. Evidence regarding the original contract dated September, 1982;

2. Evidence that the contractor had not paid its subcontractors;

3. Evidence of work for which subcontractors were paid by a company other than appellant's;

4. Two self serving letters written by agents of Olney; and

5. Testimony of a witness not identified prior to trial.

On cross-appeal Olney asks us to consider whether it was entitled to damages for delay pursuant to the terms of the the *original contract,* dated September 1, 1982, amounting to $104,792.08.

## I. *Evidentiary Issues*

We shall combine the evidentiary issues presented by appellants. These contentions will be considered in light of the well settled principle that the admission or exclusion of evidence is a function of the trial court which, on appeal, is traditionally viewed with great latitude. *Fleming v. Prince George's County,* 277 Md. 655, 358 A.2d 892 (1976). Moreover,

[f]or an item of evidence to be admissible, it must be both relevant and material. Evidence is material if it tends to establish a proposition that has legal significance to the litigation. Evidence is relevant if it is sufficiently probative of a proposition that, if established, would have legal significance to the litigation. (citation omitted).

*Paige v. Manuzak,* 57 Md.App. 621, 632, 471 A.2d 758 (1984). *See also Schear v. Motel Management Corp.,* 61 Md.App. 670, 487 A.2d 1240 (1985).

In the case *sub judice,* the trial judge did not grant appellants' Motion for Judgment as to Fidelity until the close of all the evidence. Therefore, the issue of whether Olney was entitled to damages for delay from Fidelity pursuant to the September 1, 1982, contract remained before the jury *until* the granting of that motion. Because the September 1, 1982, contract was before the jury until the granting of appellants' motion for partial summary judgment at the close of the trial, it is elementary that the initial contract and matters relating to it were relevant and material until appellants' motion was granted at the close of all the evidence. We hold that the trial judge did not abuse his discretion in permitting testimony relating to either the September 1, 1982, contract or regarding the fact that money Griffith owed its subcontractors pursuant to this contract had been paid by a company other than Griffith.

In so holding we observe that any prejudice claimed by appellants was mitigated by the trial judge's curative instruction on this matter:

The agreement that you are to consider in this case is what has been referred to throughout this entire trial as the settlement agreement. That is the contract that this case is about. There was substantial amount of reference to prior contracts, that I allowed that, because I felt that it was essential that you keep a historical prospective about the case. But please keep in mind that the contract we are talking about in this case is the settlement contract or this settlement agreement. That is the contract that is being sued upon.

Regarding appellants' contention that Olney's exhibit # 53, a letter written by an agent of Olney, should not have been admitted because it was self-serving, we note that although counsel objected at the bench that he believed this exhibit to be "self-serving," no such objection was made when this document was submitted as evidence. In fact,

the objection to Olney's exhibit # 53 seemingly was limited to the fact that the proper foundation needed to introduce a business record into evidence was lacking.

Olney introduced exhibit # 53 at trial as a business record. The letter, dated May 24, 1984, was written by W.D. Rivenbark, President of Olney, to Wm. L. Griffith, for the purpose of complaining "that you have not corrected the water problem in our lower level units as of yet." Even if we were to agree with appellants that the lower court erred in admitting this letter because it was self-serving, we observe that any prejudice appellants suffered from the introduction of this letter has become harmless. This is because a letter dated June 15, 1984, written by Wm. L. Griffith to W.D. Rivenbark, and which *thoroughly* discussed the remaining water leakage problem, was also admitted into evidence as Griffith's exhibit # 10. *Takoma Park Bank v. Abbott,* 179 Md. 249, 19 A.2d 169 (1941), *cert. denied,* 314 U.S. 672, 62 S.Ct. 134, 86 L.Ed. 538 (1942).

Appellants further aver that the lower court abused its discretion in permitting Olney's expert witness, who was not identified in pre-trial discovery, to testify regarding his estimate to replace certain of appellee's damaged and missing shrubbery.

In response to Fidelity's discovery request, Olney did not disclose the expert's name it intended to rely on, nor did Fidelity utilize Maryland Rule 2–432(b) to compel complete discovery. Olney did disclose prior to trial that it expected to rely on an estimate from Ashton Nurseries, Inc., for the replacement value of its damaged and missing shrubbery. At trial, however, Olney called Mr. Kinghorn as its expert and stated in explanation of why it was not calling the representative from Ashton Nurseries that:

> When we try to serve the guy [from Ashton Nurseries] with a subpoena, we discovered that he is no longer there and we couldn't find him anywhere.

The Court then asked appellee when Mr. Kinghorn's estimate was prepared and appellee replied:

We brought this man in to try to cover one area, the only one that he [appellant] had not received a copy of, but he did receive a copy of the *higher* estimate from Ashton Nursery. (Emphasis added).

Although Griffith moved to strike Mr. Kinghorn's testimony on the basis that "his report wasn't prepared until this week-end ... [he had] never been given notice of it," Griffith does not contest that Mr. Kinghorn's estimate was, in fact, lower than the one prepared by Ashton Nurseries and previously supplied to Griffith by Olney. Moreover, Griffith does not dispute that Mr. Kinghorn's estimate was a "fair and reasonable" one. Since the decision to impose sanctions *sua sponte*, within the framework of the discovery rules, for apparently inadequate answers to interrogatories is "within the sound discretion of the trial judge," we hold on these facts that the lower court did not abuse its discretion in permitting the testimony of Mr. Kinghorn. *Broadwater v. Arch*, 267 Md. 329, 366, 297 A.2d 671 (1972). *See also Evans v. Howard*, 256 Md. 155, 259 A.2d 528 (1969). Finding no error by the trial judge on the evidentiary issues we affirm the $71,850.33 judgment entered in favor of Olney, representing the costs of completion of the contract.

## II. *Cross Appeal*

The single issue presented by the cross appeal is whether the settlement agreement executed by the parties should be construed to be a substitute contract or an executory accord. Griffith argues that the new agreement was designed to be a substitute for the original cause of action. Olney claims it intended to surrender its prior rights and liabilities only upon full performance of the new agreement. In short, Olney contends it intended to create an executory accord.

■ An executory bilateral contract of accord has been defined as:

[a]n agreement embodying a promise express or implied to accept *at some future time* a stipulated performance in satisfaction or discharge in whole or in part of any

present claim, cause of action, contract, obligation, and promise express or implied to render such performance in satisfaction or in discharge of such claim, cause of action, contract, obligation ...

J. Calamari and J. Perillo, *The Law of Contracts* § 21–4 (2d ed. 1977) (emphasis added). *See also Clark v. Elza*, 286 Md. 208, 214, 406 A.2d 922 (1979); *Restatement of Contracts* § 417 (1932). In cases involving an executory accord the parties ordinarily intend that the duties created by the previous transaction shall be *suspended* during the period fixed for performance of the accord. A. Corbin, *Corbin on Contracts* § 1274 (1962). "If the debtor breaks such a contract, the creditor has alternative rights. He can enforce either the original duty or the subsequent contract." [3] Restatement of Contracts § 147(c) (1932).

◼ As the Court noted in *Clark v. Elza, supra*, it is often extremely difficult to determine the factual question of whether the parties to a compromise agreement intended to create an executory accord or a substitute contract. Unless, however, the evidence demonstrates that the new agreement was designed to be a substitute for the original cause of action, it is presumed that the parties each intended to surrender their old rights and liabilities only upon performance of the new agreement. *Clark*, 286 Md. at 215; 6 *Williston on Contracts* § 1846 (rev. ed. 1938).

◼ On the other hand, where the parties intended the new agreement itself to constitute a substitute for the prior claim, the substituted contract immediately discharges the

---

**3.** The concepts are distinguishable by the following examples contained in Calamari & Perillo, § 21–4 at 761–62.

Executory Accord: Creditor says to debtor, "I promise to discharge the debt you owe upon delivery of your black horse, if you promise to deliver the horse within a reasonable time."

Substituted Contract: "If you promise to deliver your black horse within 30 days, I will immediately treat the debt you owe me as discharged."

In the latter example the creditor asks for and accepts the debtor's new promise in satisfaction of the original claim thereby discharging the original claim upon the new promise made by the debtor.

original claim. Under such an arrangement, since the original claim is extinguished at the time the substitute agreement is made, recovery is limited to the substituted contract. In essence, by the court's instructions to the jury limiting the damages recoverable to the settlement agreement, the trial court concluded that the parties intended to extinguish the original agreement.

We now turn to the terms of the original and substitute contracts. The original contract made between the parties September 1, 1982, provided in *"Article 2"* that:

A charge for liquidated damages of $400.00 per day shall be paid to Owner by Contractor beginning April 1, 1983 until project is completed and accepted except for minor punch list work and subject to Article 14 of this contract. See project scheduled dated 8/1/82 attached.

The settlement agreement executed between the parties on February 11, 1984, provided that:

Disputes and differences have arisen between William L. Griffith & Company, Inc. (GRIFFITH) and Olney Associates, Inc. (OLNEY).

\* \* \* \* \* \*

However, OLNEY and GRIFFITH are anxious to resolve these disputes and differences. Accordingly, the undersigned, GRIFFITH and OLNEY, execute this Mutual and General Release and Settlement Agreement and do hereby release, acquit, and forever discharge each other, their attorneys, agents, officers, ..., of and from any and all manner of claims or causes of action, including but not limited to both judicial and administrative claims or proceedings, all debts, agreements or demands whatsoever, arising out of, or in any way connected with or involving damages, costs or expenses on account of or in any way growing out of, having already resulted or to result at any time in the future (whether or not they are presently within the contemplation of the parties and whether or not they arise following the execution of this Mutual and General Release and Settlement Agreement) by reason of or in any way connected with the allegations and claims

set forth in arising out of the pending litigation and CONTRACTS above-referenced, unless otherwise provided in this Agreement.

THE CONSIDERATION for this Mutual and General Release and Settlement Agreement is:

1. OLNEY is to pay the sum of One Hundred Eight Thousand Three Hundred Seventy-Five Dollars ($108,-375.00) to GRIFFITH as follows:

a. Ninety-Eight Thousand Three Hundred Seventy-Five Dollars ($98,375.00) cash paid upon execution of this Agreement.

b. Ten Thousand Dollars ($10,000.00) to be paid into an escrow account to the order of C. Carey Deeley, Jr., Esquire (ESCROW AGENT), upon execution of this Agreement; said escrow is to be released by the ESCROW AGENT and paid to GRIFFITH immediately upon the written instructions of Penniman and Browne, Inc. (a mutual third party selected by agreement of OLNEY and GRIFFITH) to the effect that Penniman and Browne, Inc. states that it is satisfied that the "punchlist items" attached to this Agreement (PUNCHLIST), and the water problem connected and incorporated by reference herein have been completed by GRIFFITH.

2. Within sixty (60) days, GRIFFITH is to furnish proof in writing that all subcontractors, except the asphalt subcontractor (Jack's Asphalt), have been paid for their work on the Olney Professional Park and release any claims that they may have under their respective contracts, and will indemnify OLNEY against any claims made by a subcontractor for labor and/or materials.

\* \* \* \* \* \*

4. The disbursement of the above funds to GRIFFITH and the ESCROW AGENT constitutes "final payment" under the CONTRACTS and constitutes a waiver of all claims by OLNEY under the CONTRACTS, including any claims for damages arising out of the contract or tort, except claims for the fair and reasonable cost to complete any PUNCHLIST item identified by Penniman and

Browne, Inc. as not completed by GRIFFITH as provided by this Agreement and except any warranties under the CONTRACT or as provided by law. Further, the disbursement of the funds to GRIFFITH and to the ESCROW AGENT shall constitute a waiver by GRIFFITH of all claims by GRIFFITH against OLNEY except for GRIFFITH's claim to the escrow monies once the PUNCHLIST has been completed pursuant to this Agreement.

"It is well settled that the construction of a written contract is ordinarily considered to be an issue of law for resolution by the trial judge." *James Julian Inc. v. State Hwy. Admin.*, 63 Md.App. 74, 94, 492 A.2d 308 (1985). Where a motion for judgment is also an issue, the standard for determining such a motion in a jury trial is that:

> The motion will be denied if there is relevant and competent evidence, however slight, from which a rational mind could infer a fact in issue ... All evidence must be considered in the light most favorable to the party against whom the motion is made.

*Impala Platinum Ltd. v. Impala Sales (U.S.A.) Inc.*, 283 Md. 296, 389 A.2d 887 (1978).

The claim of Olney for water damages and delay in completion of the contract can only be sustained if the substitute agreement is held to be an executory accord rather than a substituted contract. Olney's claim for delay, at the rate of $400.00 per day, is for the period April 1, 1983, to August 17, 1983,[4] totaling $55,600.00 (139 days times $400 per day). Additionally, Olney claimed $49,192.08 damages for units it was unable to sell because of construction problems, mainly water damage, under the original contract.

■ Griffith sued Olney to establish a mechanic's lien in the amount of $146,533.00. By the terms of the settlement agreement, Griffith agreed to accept $108,375.00 with $10,000.00 of that amount to be held in escrow pending the completion of a punch list attached to the agreement.

---

4. August 17, 1983, was the date Griffith allegedly finished the job.

Thus, Griffith was accepting less than he claimed and Olney was accepting the project on that basis. We think that the terms of the settlement agreement make clear that each party thereby received less than it claimed was due and owing. On cross-examination, W. Douglas Rivenbark, a principal owner of Olney, confirmed that each party made concessions. He was asked:

Q. Okay. He (Griffith) gave up some things and you (Olney) gave up some things because both of you wanted to get those lawsuits over with, right?

A. Okay.

Q. Is that correct?

A. Yes.

Q. And then go on, right?

A. Correct.

Q. And the go on part was the punchlist, right?

A. Correct.

We conclude that both parties intended to release and discharge all pending claims in exchange for a negotiated final payment and the completion of an agreed upon punch list. Our conclusion is supported by paragraph 4 which provides that the disbursement of the funds to Griffith and the escrow agent constitutes "final payment" under the contracts and constitutes a waiver of *all* claims by Olney under the contracts, including any claims for damages arising out of the contracts, except any claims for the reasonable cost to complete the punchlist. Griffith's only remaining claim was for the escrow funds once the punch list was completed. If the escrow fund had not been paid over, assuming Griffith had completed the punch list, he would not have been entitled to relitigate his original claim for $146,533.00; he could claim only the escrow fund, $10,-000.00. Conversely, Olney could claim only the cost of completion of the project which the jury determined to be $71,850.33.

In *Clark v. Elza, supra,* the plaintiffs filed suit alleging that the defendants were responsible for their injuries sustained in an automobile accident. After the case was sched-

uled for trial, settlement negotiations ensued. A figure of $9,500.00 was verbally agreed upon. The case was withdrawn from the trial docket and the defendants forwarded a release, an order of satisfaction and a settlement draft to the plaintiffs' attorney. The plaintiffs refused to conclude the settlement. The Court of Appeals (Eldridge, J.) held that an executory accord was reached by the parties and, being enforceable, the plaintiffs were not entitled to proceed with the underlying tort action in violation of their settlement agreement.

The case *sub judice* is distinguishable from *Clark* in that the release in the present case preceded the performance by either party. In *Clark*, the release did not take effect until *after* the mutual promises were performed. Olney suggests that we extend the holding in *Clark* to include releases executed in advance of performance. We decline to do so. We hold that the release extinguished the rights of either party to pursue prior claims as of the signing of the substitute agreement. The trial court properly restricted Olney's claim to the reasonable costs of completing the punch list.

JUDGMENTS AFFIRMED.

COSTS TO BE DIVIDED EQUALLY AMONG OLNEY, GRIFFITH AND FIDELITY.