553 A.2d 1308

The **HAUSWALD BAKERY**

v.

**PANTRY PRIDE ENTERPRISES, INC.**

**No. 798, Sept. Term, 1988.**

Court of Special Appeals of Maryland.

March 3, 1989.

496

David R. Burton (Lawrence I. Weisman, on the brief), Towson, for appellant.

Marvin I. Singer (Hooper, Kiefer & Cornell, on the brief), Baltimore, for appellee.

Argued before WILNER, KARWACKI and WENNER, JJ.

WILNER, Judge.

This case is mostly about executory accords, or, more particularly, alleged executory accords. The issues, which to date have not been squarely addressed in Maryland, may be summarized thusly:

Plaintiff has sued defendant. At some point in the litigation, plaintiff forms the belief that the parties have reached an executory accord to settle the dispute, calling for some payment or other performance by defendant. Defendant denies any such accord. To what extent may plaintiff both pursue the underlying claim and seek to prove and enforce the alleged executory accord? If plaintiff must elect between one or the other, when must that election be made? And finally, if plaintiff elects to pursue one remedy and fails, may he then pursue the other?

That was the dilemma facing The Hauswald Bakery, and it is not at all pleased with how the Circuit Court for Baltimore County resolved the problem.

## I. *Background*

Hauswald supplied baked goods to Pantry Pride Enterprises, Inc., which, until 1981, operated a chain of food markets in the Baltimore area. In October, 1978, Pantry Pride and several of its corporate relatives filed proceedings under Chapter 11 of the National Bankruptcy Act. At the time of that filing, Pantry Pride owed Hauswald approximately $274,000.

In order to allow Pantry Pride to continue its operations, the Bankruptcy Court approved the payment of certain "deposits" to Pantry Pride's suppliers; Hauswald received a "deposit" of $275,000. The nature and purpose of this deposit are in some dispute. It is agreed, however, that the money was paid to Hauswald and that, as a result, Hauswald continued to supply baked goods to the Pantry Pride stores until July 28, 1981, when, without advance notice, Pantry Pride closed its Baltimore operation.

During the week ending July 28, 1981, Hauswald sold and delivered to Pantry Pride $60,711 of baked goods for which

it was allegedly not paid. In May, 1984, Hauswald sued Pantry Pride in the Circuit Court for Baltimore County in an effort to collect that debt. The complaint contained two counts—one on the contract for the $60,711 plus interest and one in *quantum meruit* for the fair value of the goods. That case came to trial in June, 1986, but, for some reason neither clear nor relevant, a mistrial was declared.

On July 18, 1986—following the mistrial—Hauswald filed an amended complaint containing eight counts. Counts I and II were repetitions of the initial complaint, seeking recovery for the goods shipped during the last week of July, 1981, or their value. Counts IV through VIII arose from other alleged dealings and agreements involving, directly or indirectly, the $275,000 deposit given to Hauswald in October, 1978. There were claims of breach of contract, promissory estoppel, fraud, conversion, misappropriation of funds, and engaging in a racketeering enterprise in violation of 18 U.S.C. § 1964 (the "RICO" statute). Count III—the one most at issue here—incorporated the allegations of Counts I and II and added that "[i]n June 1984, the Defendant admitted through its assistant general counsel ... its liability under Counts I and II herein and agreed to pay said sum to Plaintiff, but then failed to pay the same, causing Plaintiff to file this suit."

Upon Pantry Pride's motion, the court dismissed Counts IV through VIII as barred by limitations, leaving open only the first three counts. Just before the commencement of the retrial, Pantry Pride, which had filed an answer denying liability on those three counts, asked the court to require Hauswald to elect whether it wished to proceed on the underlying claim set forth in Counts I and II or on what the parties and the court regarded as an alleged executory accord pled in Count III. Over Hauswald's objection, the court required the election and, in consequence, Hauswald chose to proceed on the executory accord. That, then, was the only issue tried and submitted to the jury.

The dispute boiled down to whether one David Chiras, an assistant general counsel for Pantry Pride, had acknowl-

edged liability on the part of his client and promised to pay the $60,711. In its defense against that claim, and over Hauswald's objection, Pantry Pride produced evidence regarding the nature of the $275,000 "deposit," evidence tending to show that (1) that deposit was intended as security for future deliveries of products and not as payment of any then-existing debt, (2) amounts due for such deliveries were credited against the deposit, (3) as of July 28, 1981, there was a balance of the deposit sufficient to cover the $60,711, and (4) accordingly, nothing was owed to Hauswald by reason of those last deliveries. The end purpose of this evidence was to convince the jury that, as nothing was owed to Hauswald, it was unlikely that Mr. Chiras would ever have acknowledged the liability, much less agreed to pay Hauswald the $60,711. The jury was apparently persuaded by this or other evidence offered by Pantry Pride, for it returned a defendant's verdict.

Upon the entry of that verdict, Hauswald renewed its objection to the forced election and asserted the right, having lost in its attempt to enforce the alleged executory accord, to proceed on the underlying claims. The court reaffirmed its position, however, declared the case over, and entered judgment for Pantry Pride. This appeal ensued, in which Hauswald presents three questions for review:

"1. Did the trial court improperly rule that plaintiff had to elect between trying the underlying claim and its claim of executory accord or was the underlying claim held in abeyance pending the determination of whether an executory accord existed?

2. Did the trial court improperly allow the defendant to admit evidence relating to its defense of the underlying claim since the only issue before the jury was the existence of a settlement agreement?

3. Did the trial court improperly answer the jury's question about how to calculate damages and lead the jury by including non-germane and extraneous matter in his answer?"

Pantry Pride, for its part, has cross-appealed from the court's refusal to impose sanctions on Hauswald, pursuant to Md. Rule 1–341, for filing the "RICO" claim without substantial justification. We shall answer Hauswald's first question in the affirmative; we find no merit in any of the other complaints.

## II. *Election*

In *Clark v. Elza*, 286 Md. 208, 406 A.2d 922 (1979), the Court pointed out that there are two somewhat similar, but legally distinct, methods by which parties to an action can resolve their dispute through compromise. They may enter into either a "substitute contract" or an "executory accord." A "substitute contract," as its name implies, takes the place of the underlying claim and thus immediately discharges that claim. The new contract itself constitutes performance of the defendant's alleged obligation, and the plaintiff's rights are thereafter to be found only in that contract. As the Court put it, at 214, 406 A.2d 922, "[u]nder this latter type of arrangement, since the original claim is fully extinguished at the time the agreement is made, recovery may only be had upon the substituted contract."

An "executory accord," on the other hand, denotes " 'an agreement for the *future* discharge of an existing claim by a substituted performance.... [I]t is the promised *performance* that is to discharge the existing claim, and not the promise to render such performance.' " *Id.* (quoting from 6 *Corbin on Contracts*, § 1268 at 71 (1962)) (emphasis added). Thus, quoting further from Corbin, § 1274, the Court agreed that

> " 'An accord executory does not in itself operate as a discharge of the previous claim, for the reason that it is not so intended or agreed. In nearly every case, however, the parties intend that the duty created by the previous transaction shall be suspended during the period fixed for performance of the accord. As long as the debtor has committed no breach of the accord, therefore, the creditor should be allowed to maintain no action for

the enforcement of the prior claim. His right of action should be held to be suspended as the parties intended.' " 286 Md. at 216, 406 A.2d 922. *See also id.* at 217, 406 A.2d 922:

> "Until there is a breach of the accord or a justifiable change of position based upon prospective non-performance, the original cause of action is suspended. As long as the 'debtor' ... neither breaches the accord nor provides a reasonable basis for concluding that he will not perform, the 'creditor' ... has no right to enforce the underlying cause of action."

■ Where an executory accord is indeed reached and the obligor—usually the defendant—breaches that accord by failing to tender the agreed-upon performance, the law gives the obligee (plaintiff) a choice. As currently stated in *Restatement (Second) of Contracts* § 281(2), "If there is such a breach, the obligee may enforce either the original duty or any duty under the accord." [1] This is the generally accepted rule, and it has been adopted in Maryland. *See City of Baltimore v. Landay,* 258 Md. 568, 267 A.2d 156 (1970); *Fidelity Deposit v. Olney Associates,* 72 Md.App. 367, 530 A.2d 1 (1987); 6 *Corbin on Contracts* § 1271, at 93–94. Unfortunately, this notion of election merely begs, rather than resolves, the questions before us.

■ Some good clues to the proper answers to these questions are provided by *City of Baltimore v. Landay, supra,* 258 Md. 568, 267 A.2d 156. Landay, having suffered periodic damage to his land from the overflowing of Her-

---

1. Section 281 appears in Vol. 2 of *Restatement (Second).* The provisions in that volume were adopted by the American Law Institute in May, 1979, but the bound volume was not published until 1981. Section 281 was derived from § 417 of the initial *Restatement. See* Reporter's Note to § 281. In *Clark v. Elza,* decided before the publication of Vol. 2 of *Restatement (Second),* the Court referred to and quoted § 417, including subsection (c) thereof: "If the debtor breaks such a contract the creditor has alternative rights. He can enforce either the original duty or the subsequent contract." 286 Md. at 216, 406 A.2d 922.

ring Run, sued Baltimore City and Baltimore County, accusing them of canalizing large volumes of water into the stream and failing to take proper flood control measures. As relief, he sought an injunction requiring those subdivisions either to cease depositing excessive amounts of water into the Run or to take adequate measures to control the flow of the water. At some point, the parties reached an executory accord, under which the two subdivisions agreed to take certain specific steps, within certain specified times, to correct the problem. Efforts were indeed undertaken by the defendants, and eventually they did more or less what they had agreed to do, but they clearly did not perform within the times specified in the agreement.

After the time for the promised performance had passed without actual performance being complete, Landay filed a supplemental bill alleging the accord and its breach and seeking damages, principaly for flooding that had occurred since the execution of the accord. The defendants never denied making the accord, although they did deny breaching it. By agreement of the parties, that issue was tried first. After holding the matter *sub curia* for some 14 months, the trial court held that the defendants had breached the accord by failing to perform within the specified time limits. By the time that decision was rendered, however, the promised work had, in fact, been done. Nonetheless, trial was then held on the underlying claim. Again, the defendants lost; the court found them liable and entered judgment against them for over $107,000 in damages. The only issue on appeal was whether, in light of the defendants' ultimate performance, Landay was entitled to money damages.

In considering that issue, the Court accepted the lower court's findings that (1) the defendants were liable on the underlying claim, (2) they also breached the accord by failing to perform within the times specified, and (3) the *amount* of damages awarded was appropriate. At 580, 267 A.2d 156, the Court concluded that:

"The Landays had the alternative of accepting the breach and seeking to compel performance of the original

duty of City and County and damages for non-performance of this duty. Another alternative was to compel specific performance and the award of damages accruing because of delay in performance. They could gain enjoyment of the rights accruing under either alternative but not of the rights accruing under both. In the situation before us, as generally, one cannot approbate and reprobate."

Citing § 417 of the *Restatement*, the Court further held that "the Landays could claim alternatively *in the same suit* but that they finally must elect which alternative they would use and accept, and that a *judgment reflecting that election* would bar recovery under the other theory." *Id.* at 580, 267 A.2d 156 (emphasis added). The law on the subject, the Court continued, was as set forth in *Pemrock, Inc. v. Essco Co.*, 252 Md. 374, 379, 249 A.2d 711 (1969). Noting that the Maryland Rules allowed inconsistent and alternative pleading, thus permitting a plaintiff "to join in one action either as independent or alternative claims as many claims as he may have against a defendant," the *Pemrock* Court, and thus, by confirmance, the *Landay* Court as well, observed that:

"The cases have said that if one claim or remedy is pursued *to judgment* an inconsistent claim is thereafter barred. [citations omitted.] The theory of the Maryland statements seems to have been that the plaintiff may not again vex the same defendant *if he has already taken judgment against him for the same wrong.*"

*Pemrock*, 252 Md. at 379, 249 A.2d 711 (emphasis added); *Landay*, 258 Md. at 581, 267 A.2d 156.

Proceeding from this premise, the Court held that, as the agreed-upon performance had in fact been completed before trial on the underlying claim, Landay had effectively gotten what he had agreed to accept, just as if the court had directed specific performance of the executory accord. For that reason, the Court declared that he was not entitled to pursue the underlying claim and that his entitlement to

damages was limited to those damages accruing as the result of the delay in performance.

The principle, that an election between inconsistent or alternative remedies need not be made until after judgment is rendered, was confirmed again in *Cook v. Alexandria Nat'l Bank*, 263 Md. 147, 282 A.2d 97 (1971). Citing *Landay*, among other cases, the Court held at 150, 282 A.2d 97:

> "The decisions of this court have recognized this modern trend in the rules of pleading and we have adopted the proposition that an irrevocable election is not made *until after* a final valid judgment. The mere initiation of a suit, prior to its becoming a final valid judgment, does not constitute an election which would bar either an amended claim from being filed in the same action or a totally different remedy in an independent action."

(Emphasis in original.)

On reflection, the need for this approach, especially in cases of this kind, is compelling. Any other rule, requiring an affirmative, binding election prior to judgment, would be inconsistent with the principle that an executory accord merely *suspends* the plaintiff's right to prosecute his underlying claim and does *not*, as in the case of a "substitute contract," extinguish that claim. Prosecution of the underlying claim is suspended in order to give the defendant/obligor an opportunity to tender the agreed-upon substitute performance; but if, for whatever reason, that substitute performance is not forthcoming, the whole *raison d'etre* of the suspension evaporates, and the plaintiff's right to pursue his initial claim revives. Whether the failure of the substitute performance arises from a successful denial of the existence of the accord or a repudiation or breach of it would seem to be immaterial in this regard.

The appropriate way to proceed, we think, is to allow a plaintiff such as Hauswald to proceed to trial on both claims, and, to the extent that the evidence is legally sufficient, to submit both to the trier of fact. If the trier of

fact declares for the plaintiff on one claim and for the defendant on the other, that will be the judgment. If it declares for the plaintiff on both, finding that the defendant is liable on the underlying claim and also breached an executory accord to settle that claim, the plaintiff will then have to make his election so that a judgment can be entered on one claim or the other, but not both.[2]

It follows from this that the court erred in requiring Hauswald to make an election prior to trial and in limiting the issue in accordance with the forced election.

### III. *Hauswald's Other Issues*

■ As we indicated, in an effort to show that Mr. Chiras never made the admission or promise that formed the basis of Hauswald's claim of executory accord, Pantry Pride was allowed to produce evidence indicating that nothing was due to Hauswald—that the $275,000 paid to Hauswald in October 1978 was a deposit against which future deliveries were to be credited and that, as of July 28, 1981, there was a sufficient balance of that deposit to cover the $60,711 claimed by Hauswald. That evidence, Hauswald claims, related to the merits of the underlying claim rather than to the existence of an executory accord "thereby confusing the jury beyond correction."

We do not agree. Much of that evidence did, of course, tend to show that there was no debt owing to Hauswald, at least in Pantry Pride's opinion. But that was also relevant to the issue properly before the jury—whether Mr. Chiras made the admission and promise alleged. If Pantry Pride

---

2. We deal here, of course, with the situation in which the *plaintiff* is seeking to enforce the executory accord. A somewhat different procedure may be required where the plaintiff is proceeding only upon the underlying claim and the *defendant* seeks to enforce an executory accord as a defense to that claim. In that setting, although for judicial efficiency it may be appropriate to require the trier of fact to consider and return verdicts on both issues, if the finding is that there *was* an accord that was not breached by the defendant, the plaintiff will be limited to his remedy under that accord, and will not have an election. *See Plant City Steel Corp. v. National Mach. Exch., Inc.*, 23 N.Y.2d 472, 297 N.Y.S.2d 559, 562, 245 N.E.2d 213, 215 (1969).

indeed believed that nothing whatever was due to Hauswald, and that, in fact, there was a net balance due to Pantry Pride, it would be unlikely to authorize or permit its agent to agree to pay the full sum claimed to be due by Hauswald.

Finally, Hauswald complains about the court's response to a question sent out by the jury during its deliberations. We have examined the question and the response and find no error. There was nothing erroneous, misleading, or prejudicial in the response.

## IV. *Cross Appeal*

▮▮▮▮ At the conclusion of the case, counsel for Pantry Pride orally moved the court to impose sanctions against Hauswald's attorney for filing Counts IV through VIII of the amended complaint without substantial justification. Those counts, he claimed, were obviously barred by limitations, and their filing, he tells us, "was clearly an attempt to 'blackjack' Pantry Pride into a settlement." The court heard argument and, in the exercise of the discretion afforded it by Rule 1–341, denied the motion. Although the court could very well and properly have ruled the other way, we find no abuse of that discretion.[3]

---

3. Although Pantry Pride's motion for sanctions was grounded on the filing and prosecution of Counts IV—VIII by Hauswald, it seems from the argument on the motion that counsel for Pantry Pride was incensed as much by some scurrilous remarks made about him by trial counsel for Hauswald as by the four counts. His anger in that regard was fully justified. In an earlier motion for sanctions, Hauswald's lawyer had accused him (1) of having "acted in a dishonest fashion by filing a frivolous Motion for Summary Judgment" and (2) of failing to cite a relevant case, which failure he characterized as "a clear showing of contempt before this Court [and] a deliberate attempt to mislead this court."

There was no excuse in this case for that kind of intemperate language; nor was there any basis for the motion, which was denied. Although we know of no law requiring lawyers to be courteous to and respectful of one another, if the practice of law is to retain any vestige of its traditional and vaunted position as a "learned profession," some measure of civility among its practitioners will have to be observed, even in the heat of battle. We find equally distressing a growing tendency on the part of some lawyers to file a motion under Rule

## V. *Conclusion*

The only error that we see here is in the court's refusal to permit Hauswald to proceed alternatively on its underlying claim. We find no infirmity in the judgment based on the claim of executory accord. The one error is easily correctable, by remanding the case for trial on the underlying claim. That is what we shall do.

JUDGMENT ON COUNT III OF AMENDED COMPLAINT AFFIRMED; CASE REMANDED TO CIRCUIT COURT FOR BALTIMORE COUNTY FOR TRIAL ON COUNTS I AND II; APPELLEE TO PAY THE COSTS.

1–341 almost routinely, as a Pavlovian response to whatever the other side does. We would caution those heading in that direction that the frivolous and unjustified filing of any motion, including one under Md. Rule 1–341, may not only be grounds for sanctions under that Rule but may also constitute a violation of Rule 3.1 of the Rules of Professional Conduct.