707 A.2d 913

**CHICAGO TITLE INSURANCE COMPANY**

v.

**LUMBERMEN'S MUTUAL CASUALTY COMPANY.**

**No. 816, Sept. Term, 1997.**

Court of Special Appeals of Maryland.

April 2, 1998.

**540**

Matthew B. Ruble, Frederick, for appellant.

William H. Schladt (Ward & Klein, Chartered, on the brief), Gaitersburg, foe appellee.

Before DAVIS, HOLLANDER and EYLER, JJ.

HOLLANDER, Judge.

This appeal focuses on whether a release in favor of two insureds resulted in the discharge of claims against their surety. Chicago Title Insurance Company ("Chicago"), appellant, challenges the entry of summary judgment in favor of appellee, Lumbermen's Mutual Casualty Company ("Lumbermen's"), the surety herein. Summary judgment was predicated on Chicago's prior settlement of claims with its former title insurance agent, Academy Title Group, Inc. ("Academy"), and Academy's principal officer, David Therrien (collectively, the "insureds" or "agents"); Lumbermen's was the agents' surety.

Appellant presents three questions for our review, which we have reordered and rephrased:

 I. Did the trial court err in concluding that Chicago's release and dismissal of claims against its former title agents also discharged Chicago's claim against Lumbermen's, the agents' surety, even though Chicago intended to preserve that claim?

 II. Did the trial court err in its alternative conclusion that Lumbermen's was released from its surety obligation because the amount that Chicago received in its settlement with its agents equaled the maximum amount available under the surety bond?

III. Did the trial court err in allowing Academy and Therrien to speak as a "friend of the court" at the summary judgment hearing?

For the reasons that follow, we shall affirm.

## Factual Background [1]

Chicago is a Missouri Corporation that underwrites real estate title insurance policies in Maryland. Between December 1993 and February 1995, Academy served as an insurance agent for Chicago, pursuant to an agency agreement. Therrien was a principal of Academy. As a title insurance agent, Academy was required to post a title insurance agent's bond, in accordance with Md.Code (1957, 1994 Repl.Vol.), Art. 48A, § 168A.[2] The purpose of the bond is to protect unknown third parties from misappropriation of settlement funds held or to be held in escrow. Lumbermen's, which has its principal office in Philadelphia, Pennsylvania, provided the surety bond for Academy and Therrien, in the amount of $100,000.00. Therrien executed an indemnity agreement providing that he and Academy would indemnify Lumbermen's "against all loss, liability, costs, damages, attorneys' fees and expenses" that Lumbermen's may incur in investigating, defending, and prosecuting any action brought in connection with the bond agreement. Chicago was not a party to the indemnity agreement.

In February 1995, Academy notified Chicago that it had overdrawn its settlement escrow account. This caused Chicago to terminate its agency contract with Academy. After an investigation, Chicago determined that Academy had misappropriated funds from its escrow account. As a result, Chicago used its own funds to satisfy liens and to correct title defects that it had insured.

---

1. In view of the posture of the case, we will present the facts essentially as set forth by appellant.

2. The provision is now contained in Md.Code (1997), § 10–121 of the Insurance Article.

Chicago subsequently filed a four-count complaint against Academy, Therrien, and Lumbermen's. The first three counts were lodged against Academy and Therrien, alleging breach of contract, breach of fiduciary duty, and seeking injunctive relief. In the fourth count, asserted only against Lumbermen's, Chicago sought payment under Academy's surety bond. Although Chicago alleged that it could not quantify its damages, it asserted the amount was in excess of the $100,000.00 bond issued by Lumbermen's.

Executive Risk Indemnity, Inc. ("Executive") was the errors and omissions insurance carrier for Academy and Therrien. Pursuant to a reservation of rights, Executive provided Academy and Therrien with legal counsel in connection with Chicago's suit. It then filed its own suit against Academy, Therrien, and Chicago in federal court, seeking a declaratory judgment that Chicago's claims against Academy and Therrien were not covered by the errors and omissions policy that Executive had issued to them.

During the pendency of the suits instituted by Chicago and Executive, Chicago, Executive, Academy, and Therrien reached a mediated settlement with regard to their respective claims. In August 1996, they executed the "Settlement Agreement and General Release of Claims" (the "Release"). Lumbermen's was not involved in the settlement, however,[3] and was not a party to the Release.

The Release provided, *inter alia:* (1) in the Chicago action, Chicago, Academy, and Therrien would jointly move the court for an order dismissing Academy and Therrien, with prejudice; (2) upon dismissal of Chicago's claims against Academy and Therrien, Executive would pay $100,000.00 to Chicago as payment for Chicago's attorneys' fees in connection with Chicago's action against Academy, Therrien, and Lumbermen's; (3) upon dismissal of Chicago's claims, Executive would dismiss its declaratory action in federal court; (4) Executive

---

**3.** Chicago and Lumbermen's dispute the reasons for which Lumbermen's did not participate in the settlement negotiations. For our purposes, those reasons are of no moment.

would release Chicago, Academy, and Therrien from all claims relating to the Chicago and Executive suits; (5) Chicago would release Executive, Academy, and Therrien from all claims relating to the Executive policy, the Chicago suit, and the Executive suit; (6) Academy would release Chicago and Executive from all claims relating to the Chicago and Executive suits; and (7) Therrien would release Executive from all claims relating to the Chicago and Executive suits. Moreover, the Release stated that it was "a full and complete settlement."

In accordance with the terms of the Release, on October 23, 1996, Chicago, Academy, and Therrien filed a joint motion to dismiss Academy and Therrien from the suit filed by Chicago. In its response to the motion, Lumbermen's argued that release of Academy and Therrien also required dismissal of Chicago's claims against Lumbermen's. On November 19, 1996, the court (Cawood, J.) dismissed Chicago's claims against Academy and Therrien, with prejudice. The court also ordered that Lumbermen's response to the motion be treated as a motion to dismiss the claims against it. On the same day, Lumbermen's filed a cross-claim against Academy and Therrien, alleging that Lumbermen's was entitled to indemnification from Academy and Therrien for any damages that might be imposed against Lumbermen's in the Chicago action.

Lumbermen's then filed a motion for summary judgment, arguing that Chicago's release of Academy and Therrien discharged the surety claim, and therefore Lumbermen's was entitled to judgment as a matter of law. In March 1997, the court heard argument on the motion filed by Academy and Therrien to strike Lumbermen's cross-claim. At the same time, it also considered the summary judgment motion filed by Lumbermen's. At the hearing, over Chicago's objection, the court permitted counsel for Academy and Therrien to speak as "a friend of the court" with regard to Lumbermen's motion. The substance of Academy's and Therrien's argument was to advise the court that the *Restatement (Third) of Suretyship and Guaranty* § 39 (1996) (hereinafter *"Restatement*

*(Third)* ") addressed the issue before the court in connection with the summary judgment motion. Thereafter, the court (Wolff, J.) issued a memorandum opinion and order granting summary judgment in favor of Lumbermen's.[4]

In its review of the Release, the court found it clear that Chicago did not provide for the discharge of Lumbermen's in the Release, although Chicago had released Academy and Therrien. Therefore, the court concluded that, notwithstanding Chicago's intention to preserve its claims against Lumbermen's, the complete discharge of Chicago's claims against Academy and Therrien operated to discharge Lumbermen's from any liabilities under the surety bond. In its well-reasoned opinion, the court stated:

> It is clear from our review of the settlement agreement that Chicago had not released its claim against Lumbermen's. That fact is undisputed by Chicago and by Lumbermen's. However, it is equally clear and undisputed that Chicago had released Academy and Therrien from any claim by Chicago.

> The issue then, is whether, as a matter of law, Chicago may pursue a claim against Lumbermen's where the principal obligors have been released and, if they may, whether Lumbermen's may maintain a right of subrogation against Academy and Therrien

> \* \* \* \*

> Chicago repeatedly claims and cites case law supporting the proposition that the intent of the parties is crucial in determining the effect of the release. Chicago claims that the settlement agreement manifests a clear intent not to discharge Lumbermen's. While this may be true, this

---

4. In its order, the court granted the motion to strike Lumbermen's cross-claim. Lumbermen's cross-claim is not before us, however. When the trial court granted summary judgment in favor of Lumbermen's and against Chicago, Lumbermen's cross-claim against Academy and Therrien became moot.

Court can not ignore the plain language relating to the release of Academy and Therrien.

\* \* \* \*

This Court finds that the full settlement of claims against Academy and Therrien and the subsequent dismissal of the civil claims against them operates to discharge Lumbermen's from any duties under the surety bond. While Chicago did not release its claim against Lumbermen's in the settlement agreement, by settling any and all claims in full that it had against Academy and Therrien, the derivative claim against the surety is extinguished by operation of law.

In addition, the court was persuaded by the *Restatement (Third)* § 39(c)(i) that, even if the release of Academy and Therrien did not discharge Lumbermen's, the surety was discharged up to the extent of the value of the consideration for the Release. The court said: "Since Chicago has already recovered $100,000 from Academy and since Lumbermen's surety bond provides coverage up to $100,000 Lumbermen's would be released in full."

We will include additional facts in our discussion.

### Standard of Review

Md. Rule 2–501 establishes a two-part test for summary judgment. "In deciding a motion for summary judgment ... the trial court must decide whether there is any genuine dispute as to material facts and, if not, whether either party is entitled to judgment as a matter of law." *Bagwell v. Peninsula Regional Medical Ctr.*, 106 Md.App. 470, 488, 665 A.2d 297 (1995), *cert. denied*, 341 Md. 172, 669 A.2d 1360 (1996); *see also Beatty v. Trailmaster Prods., Inc.*, 330 Md. 726, 737–38, 625 A.2d 1005 (1993); *Bits "N" Bytes Computer Supplies, Inc. v. Chesapeake & Potomac Tel. Co.*, 97 Md.App. 557, 580–81, 631 A.2d 485 (1993), *cert. denied*, 333 Md. 385, 635 A.2d 425 (1994); *Seaboard Sur. Co. v. Richard F. Kline, Inc.*, 91 Md.App. 236, 242–45, 603 A.2d 1357 (1992).

On review, like the trial court, we must determine whether there are any genuine disputes of material fact. *Honaker v. W.C. & A.N. Miller Dev. Co.*, 285 Md. 216, 230–31, 401 A.2d 1013 (1979); *Impala Platinum, Ltd. v. Impala Sales (U.S.A), Inc.*, 283 Md. 296, 326, 389 A.2d 887 (1978). In order to defeat the motion for summary judgment, the party opposing the motion must produce evidence demonstrating that the parties genuinely dispute a material fact. *Scroggins v. Dahne*, 335 Md. 688, 691, 645 A.2d 1160 (1994); *Fearnow v. Chesapeake & Potomac Tel. Co.*, 104 Md.App. 1, 49, 655 A.2d 1 (1995), *aff'd. in part and rev'd in part*, 342 Md. 363, 676 A.2d 65 (1996). A material fact is one that "will alter the outcome of the case depending upon how the factfinder resolves the dispute over it." *Bagwell*, 106 Md.App. at 489, 665 A.2d 297; *see also King v. Bankerd*, 303 Md. 98, 111, 492 A.2d 608 (1985). To demonstrate a factual dispute and defeat the motion, the non-moving party must present more than "mere general allegations which do not show facts in detail and with precision." *Beatty*, 330 Md. at 738, 625 A.2d 1005. In this regard, all factual disputes are resolved in favor of the non-moving party. Moreover, all inferences reasonably drawn from the facts must be resolved in favor of the non-moving party. *Tennant v. Shoppers Food Warehouse Md. Corp.*, 115 Md.App. 381, 387, 693 A.2d 370 (1997); *see also Berkey v. Delia*, 287 Md. 302, 304–05, 413 A.2d 170 (1980); *Maloney v. Carling Nat'l Breweries, Inc.*, 52 Md.App. 556, 560–61, 451 A.2d 343 (1982).

If there are no disputes of material fact, the trial court resolves the case as a matter of law. *Fearnow*, 104 Md.App. at 48, 655 A.2d 1. We then review the trial court's decision to determine whether the court reached the correct legal result. *Beatty*, 330 Md. at 737, 625 A.2d 1005. Appellate courts generally review a grant of summary judgment based "only on the grounds relied upon by the trial court." *Blades v. Woods*, 338 Md. 475, 478, 659 A.2d 872 (1995); *see also Gross v. Sussex Inc.*, 332 Md. 247, 254 n. 3, 630 A.2d 1156 (1993); *Hoffman v. United Iron and Metal Co.*, 108 Md.App. 117, 132–33, 671 A.2d 55 (1996).

### Discussion

 Releases are contractual, and they are therefore governed by ordinary contract principles. *See Bernstein v. Kapneck,* 290 Md. 452, 457–58, 430 A.2d 602 (1981); *Parish v. Maryland & Virginia Milk Producers Ass'n,* 250 Md. 24, 101, 242 A.2d 512 (1968); *see also, e.g, Creamer v. Helferstay,* 294 Md. 107, 448 A.2d 332 (1982). The principal rule governing the interpretation of a release, as with other contracts, is to effect the intention of the parties. *See Hartford Accident and Indem. Co. v. Scarlett Harbor Assocs. Ltd. Partnership,* 109 Md.App. 217, 290–91, 674 A.2d 106 (1996), *aff'd,* 346 Md. 122, 695 A.2d 153 (1997); *see also Wheaton Triangle Lanes, Inc. v. Rinaldi,* 236 Md. 525, 530–31, 204 A.2d 537 (1964); *Shriver v. Carlin & Fulton Co.,* 155 Md. 51, 64, 141 A. 434 (1928); *Kramer v. Emche,* 64 Md.App. 27, 37, 494 A.2d 225, *cert. denied,* 304 Md. 297, 498 A.2d 1184 (1985); *Federal Land Bank of Baltimore, Inc. v. Esham,* 43 Md.App. 446, 465, 406 A.2d 928 (1979); *Roe v. Citizens Nat'l Bank,* 32 Md.App. 1, 3–8, 358 A.2d 267 (1976); *see also Pantazes v. Pantazes,* 77 Md.App. 712, 720, 551 A.2d 916, *cert. denied,* 315 Md. 692, 556 A.2d 673 (1989). "The primary source for determining the intention of the parties is the language of the contract itself." *Scarlett Harbor,* 109 Md.App. at 291, 674 A.2d 106.

 The interpretation of unambiguous contract terms presents a question of law for the court to resolve. *Keyworth v. Industrial Sales Co.,* 241 Md. 453, 456, 217 A.2d 253 (1966); *Shapiro v. Massengill,* 105 Md.App. 743, 754, 661 A.2d 202 *cert. denied,* 341 Md. 28, 668 A.2d 36 (1995); *McIntyre v. Guild, Inc.,* 105 Md.App. 332, 355, 659 A.2d 398 (1995). When the language of the contract is clear, the court will presume that the parties intended what they expressed, even if the expression differs from the parties' intentions at the time they created the contract. *Roged, Inc. v. Paglee,* 280 Md. 248, 254, 372 A.2d 1059 (1977); *Scarlett Harbor,* 109 Md.App. at 291, 674 A.2d 106; *McIntyre,* 105 Md.App. at 355, 659 A.2d 398; *Shapiro,* 105 Md.App. at 754, 661 A.2d 202; *Bernstein v. Kapneck,* 46 Md.App. 231, 244, 417 A.2d 456 (1980), *aff'd,* 290

Md. 452, 430 A.2d 602 (1981). When the language of the contract is ambiguous, however, the ambiguity must be resolved by the trier of fact. *Shapiro,* 105 Md.App. at 754–55, 661 A.2d 202.

■ It is undisputed that, in its settlement agreement, Chicago did not intend to release appellee from suit, notwithstanding that it fully released Academy and Therrien. The settlement agreement stated, in pertinent part:

> ... Chicago Title, on behalf of itself and its related persons, hereby *releases, acquits and forever discharges Academy Title and Therrien and their respective predecessors and successors in business and interest,* past, present and future parent corporations, subsidiaries, affiliates, assigns, liquidators, administrators, executors, shareholders, officers, directors, employees, attorneys, agents, and all persons claiming through them ... *from any and all claims,* counterclaims, demands, payments, rights, obligations, loss, judgments, awards, attorneys fees, costs, fees, interest, damages, claims, liabilities or causes of action of whatever kind or character that it has asserted or might have asserted, whether known or unknown, and whether based upon statute, common law, regulation, or any other source of legal authority of any type, in connection with, arising out of, or in any way relating to any acts, circumstances, facts, omissions or other subject matters involved, embraced within, *arising out of, relating to or otherwise touching upon the Chicago Title Action;* the facts and circumstances giving rise to the Chicago Title Action....

(Emphasis added). Therefore, we must determine, as a matter of law, whether Chicago's settlement with Academy and Therrien, and its execution of the Release, operated to discharge Lumbermen's from any duty under its surety bond, thereby precluding Chicago's right to pursue any recovery from Lumbermen's based on the conduct of Lumbermen's insureds, Academy and Therrien.

As a threshhold matter, we note that the parties all characterize Lumbermen's role as that of a surety, rather than a

guarantor. The terms are often used interchangeably and, for the most part, the distinction is immaterial for purposes of the doctrines governing the relationships between a surety or guarantor and the obligee and obligor. *See* Laurence P. Simpson, *Handbook on the Law of Suretyship* 8 (1950). Nevertheless, Maryland does recognize a distinction between a guarantor and a surety. *See General Motors Acceptance Corp. v. Daniels,* 303 Md. 254, 259–61, 492 A.2d 1306 (1985); *Mercantile Club, Inc. v. Scherr,* 102 Md.App. 757, 766–68, 651 A.2d 456 (1995). The *Daniels* Court explained:

> A contract of suretyship is a tripartite agreement among a principal obligor, his obligee, and a surety. This contract is a direct and original undertaking under which the surety is primarily or jointly liable with the principal obligor and therefore is responsible at once if the principal obligor fails to perform. A surety is usually bound with his principal by the same instrument, executed at the same time, and on the same consideration. . . .
>
> Ultimate liability rests upon the principal obligor rather than the surety, but the obligee has a remedy against both. . . .
>
> A contract of guaranty, similar to a contract of suretyship, is an accessory contract. Despite this similarity, a contract of guaranty has several distinguishing characteristics. First, this particular contract is collateral to and independent of the principal contract that is guaranteed and, as a result, the guarantor is not a party to the principal obligation. A guarantor is therefore secondarily liable to the creditor on his contract and his promise to answer for the debt, default, or miscarriage of another becomes absolute upon default of the principal debtor and the satisfaction of the conditions precedent to liability.

*Daniels,* 303 Md. at 259–60, 492 A.2d 1306 (citations omitted).

Although it would appear that Lumbermen's role here is that of a guarantor, rather than a surety, we need not resolve this matter, because it is undisputed that Lumbermen's liability in this case is derivative of the liability of Academy and

Therrien. For purposes of our discussion, we will use the term "surety" in the broad sense to refer to Lumbermen's, as it is the common term used in discussing the doctrines applicable here. *See* Simpson, *supra*, at 6–8; *see generally id.* at 5–11.

As a general rule, the release of the principal discharges the surety.[5] *Noma Electric Corp. v. Fidelity & Deposit Co.*, 201 Md. 407, 412, 94 A.2d 277 (1953); *Fidelity Deposit Co. v. Olney Assocs., Inc.*, 72 Md.App. 367, 371 n. 2, 530 A.2d 1 (1987); 74 Am.Jur.2d *Suretyship* § 98, at 71–72 (1995). "The effect given to a release may, however, depend upon the intention and perhaps upon a showing of prejudice." *Noma Electric*, 201 Md. at 412, 94 A.2d 277 (citations and internal quotations omitted).

It is uncontroverted, as we noted, that Chicago did not intend to release Lumbermen's. The release stated: "If Chicago Title's claims against Lumbermens asserted in the Chicago Title Action proceed to trial, Academy Title shall voluntarily produce one of its officers to testify at deposition and/or trial, upon the request of Chicago Title." Because Chicago did not intend to release Lumbermen's when it released the agents, it contends that it should be permitted to pursue its action against Lumbermen's.

We turn to an 1833 case for guidance. In *Clagett v. Salmon*, 5 G. & J. 314 (1833), the Court considered a release that sought to preserve a claim against the surety. Clagett had operated a business and Salmon loaned him money. In return, Clagett, his mother, and his siblings agreed to indemnify Salmon in the event of loss resulting from Clagett's default. To secure their agreement of indemnity, they executed a mortgage on their real and personal property. Thereafter, when Clagett was unable to meet his obligations to

---

**5.** We note that there are cases stating that *discharge* of the principal obligor does not discharge the surety. We read the term "discharge" in those cases to mean discharge in bankruptcy. *See Weast v. Arnold*, 299 Md. 540, 555, 474 A.2d 904 (1984); *Scherr*, 102 Md.App. at 766, 651 A.2d 456. Thus, they are not applicable here.

Salmon and other creditors, he placed his assets in a trust for the benefit of his creditors. Salmon, Clagett, and the trust administrators executed the release in issue, which provided, *inter alia*, that Salmon would retain the mortgage to indemnify him in the event of any deficiency, notwithstanding the release. The release also said:

> "It is expressly understood that nothing contained in this agreement shall in any manner affect the mortgage heretofore given by Thomas Clagett and his family, to indemnify said Salmon against certain risks and losses, except so far as to delay foreclosing said mortgage for two years from the date hereof."

*Id.* at 319.

The Court concluded that the express reservation in the release did not discharge the surety. It stated:

> Here then, we find an express contract on the part of Thomas Clagett, that notwithstanding this agreement for his discharge, the remedy of Salmon upon the mortgage, should not in the slightest manner be affected by it, but that his rights should remain the same as they were before such agreement, with the exception only of the delay of foreclosure, as therein stated. This reservation of his rights to proceed against the sureties, contained in the same instrument stipulating for the discharge of the principal, amounted to an agreement on the part of the principal, to waive the benefit of that discharge, and to hold himself responsible to his sureties, in case Salmon should find it necessary to resort to them for payment or indemnity. As therefore in such an event, their right and remedies against Clagett remained wholly unimpaired and unaffected, we do not perceive that they have any cause to complain, or that there is any ground, either in law, justice or reason, upon which they can claim to be discharged. By coercing payment from the sureties under this express agreement, no fraud would be practised [sic] upon the principal, or injustice done to him, in case they should resort to him for reimbursement or indemnity; because the assent of the principal to continue

liable to them, was implied in the reservation of the rights of the creditor to proceed against the sureties.

*Id.* at 355–56. Thus, the Court held that the sureties were not discharged, and affirmed the trial court.

The trial court had discussed the importance of the debtor's consent to the creditor's reservation of rights against the surety, stating:

> If [the] general reservation [of rights] had been made in an agreement between Salmon and the other creditors of Thomas Clagett alone, there might have been some difficulty in treating it as such a reservation as would preserve to the sureties the benefit of the implied contract in all respects; *because it is not enough that the creditor alone should make such a stipulation, the principal debtor must also consent, that his liability to the surety should remain entire and undiminished.* But here, Thomas Clagett, by signing this agreement, has thereby distinctly assented to this express reservation of the remedies upon the mortgage itself, as well as upon its incident implied contract; for the stipulation, that nothing therein contained should affect the mortgage, must, according to every fair interpretation of the expression, be considered a complete reservation of the remedies to this whole extent. And so considered, it is clear, that these sureties cannot found any claim to be discharged from the mortgage upon anything contained in the agreement. . . .

*Id.* at 333 (emphasis added).

The case of *Shriver v. Carlin & Fulton Co.,* 155 Md. 51, 141 A. 434 (1928), also provides guidance. There, the plaintiff obtained a judgment in the amount of $5,273.75 against multiple defendants. The plaintiff then obtained an order stating that the case against one of the judgment debtors would be settled upon that debtor's payment of costs. The order stated: "'Please enter this case agreed and settled as to G. Howard White only, upon payment of costs by the said G. Howard White.'" *Id.* at 53, 141 A. 434. One of the other judgment debtors appealed, arguing that the settlement as to

one operated as a release of all. The Court disagreed. In reviewing the harshness of the common law rule that a release of one obligor in a bond or one joint tortfeasor operated to discharge all others jointly bound, the Court applied equitable principles that tempered the operation of the rule. The Court reasoned that, if the parties intended to reserve their rights against the co-obligors or other tortfeasors, the agreement would be construed as a covenant not to sue, rather than as a release.

What the *Shriver* Court explained as to the operation of a release is pertinent here:

"Although many early cases may be cited to the effect that the rule applied by courts of law was otherwise, and that a saving clause repugnant to the nature of the grant was void, and that the grant remained absolute and unqualified, such is not the modern rule of construction. The equitable rule now prevails, and a release is to be construed to the intent of the parties and the object and purpose of the instrument, and that intent will control and limit its operation. Hence, the legal operation of a release of one of two or more joint debtors may be restrained by *an express provision in the instrument that it shall not operate as to the other.*"

*Shriver,* 155 Md. at 64, 141 A. 434 (emphasis added) (quoting 23 R.C.L. 404).

The rule established in *Shriver* continues today. In *Wheaton Triangle Lanes, Inc. v. Rinaldi,* 236 Md. 525, 204 A.2d 537 (1964), the Court said:

[T]he rule concerning releases is stated by this Court in *Shriver v. Carlin & Fulton Co.:* " * * * 'The equitable rule now prevails, and a release is to be construed according to the intent of the parties and the object and purpose of the instrument, and that intent will control and limit its operation.' "

*Id.* at 531, 204 A.2d 537 (citations omitted) (quoting *Shriver,* 155 Md. at 64, 141 A. 434). Subsequently, in *Roe v. Citizens National Bank,* 32 Md.App. 1, 358 A.2d 267 (1976), we referred to *Wheaton*'s quotation of *Shriver* as "a clear expres-

sion of the law of Maryland...." *Roe,* 32 Md.App. at 11, 358 A.2d 267; *see also Kramer v. Emche,* 64 Md.App. 27, 37, 494 A.2d 225 ("'A right against other debtors is held to be reserved in any case where it appears from the terms of the release that it was not intended or expected that all the debtors should be released.'" (quoting *Roe,* 32 Md.App. at 6, 358 A.2d 267)), *cert. denied,* 304 Md. 297, 498 A.2d 1184 (1985).

We underscore that the rule from *Shriver* establishes that, in order to pursue a surety, a release must demonstrate not only that the parties did not intend to release the surety, *but that the creditor expressly reserved its rights to pursue the surety.* The rule, known as the "reservation of rights" doctrine, was correctly stated in *Federal Land Bank of Baltimore, Inc. v. Esham,* 43 Md.App. 446, 406 A.2d 928 (1979): "If the creditor clearly manifests in the release instrument an intention to reserve its rights against the remaining obligors, then that intention will be given effect by the courts." *Id.* at 465, 406 A.2d 928. Moreover, we note that, regardless of how the doctrine was described in the cases cited above, the releases in those cases clearly satisfied the rule requiring an express reservation of the creditor's rights. *See, e.g., Wheaton,* 236 Md. at 530, 204 A.2d 537 ("' ... saving and excepting from the operation hereafter, however, and preserving the obligations specifically provided to be assumed in, and the rights of indemnity arising in accordance with or pursuant to, the Settlement Agreement....'"); *Kramer,* 64 Md.App. at 35, 494 A.2d 225 ("The Party of the First Part and the Party of the Second Part agree that this Release and Covenant not to Sue is not to be construed as and is not intended to be a joint tort-feasor release...."); *Esham,* 43 Md.App. at 465–66, 406 A.2d 928 ("'If said net proceeds to Land Bank/PCA shall be insufficient to pay said debt ... to Land Bank/PCA, it is understood that Land Bank/PCA ... shall release all claims ... against the Trustee or the assets of Bankrupt, but *shall be free to proceed against any other assets of Esham or any other parties ... indebted to Land Bank/PCA....'"); Roe,* 32 Md.App. at 2, 358 A.2d 267 ("'It is understood and acknowledged that the granting of this general release to [one

joint obligor] shall not release [the other joint obligor] from any obligations which they have....' ").

The *Restatement of Security* § 122 (1941) is consistent with this view. It states:

Where the creditor releases a principal, the surety is discharged, unless

(a) the surety consents to remain liable notwithstanding the release, or

(b) *the creditor in the release reserves his rights against the surety.*

(Emphasis added).

Applying the principles of *Shriver* and the *Restatement of Security*, it appears that when a creditor releases the principal, but expressly reserves the creditor's right to pursue the surety, the release is viewed only as a covenant by the creditor not to sue the principal. The result is that the creditor can pursue the surety, and the surety—not the creditor—may then recover from the principal. The *Restatement of Security* explains:

Where the creditor releases the principal but reserves his rights against the surety, this is construed as a covenant not to sue the principal. Historically, the covenant not to sue did not prevent a suit in violation of the covenant, although a liability might be incurred by such a suit. The creditor, by a release with reservation of rights against the surety, was in effect notifying the principal that, in spite of the release, the surety might pay as the result of compulsion or voluntarily and that the principal would then be liable to reimburse the surety. Since the release was regarded as only a covenant not to sue, even the surety's right of subrogation was technically preserved. The reservation of rights showed that the creditor had no intention to release the surety. The principal had no cause for complaint since, having accepted his release with the reservation, he necessarily accepted the consequence that the liability might still be enforced against him through action by the surety.

*Restatement of Security* § 122 Comment (d); *see also* Arthur A. Stearns, *Law of Suretyship* § 6.42, at 175 (5th ed.1951).

It is noteworthy that when a release actually amounts to a covenant not to sue, the result may be a release that is worthless insofar as the principal debtor is concerned; if the creditor is successful against the surety, then the surety, in turn, may proceed to recover against the principal, notwithstanding the creditor's earlier release of the principal. *See* Neil B. Cohen, *Striking the Balance: The Evolving Nature of Suretyship Defenses,* 34 Wm. & Mary L.Rev. 1025, 1044 (1993) ("Only the most sophisticated principal obligors would realize that a release, extension, or other modification of their obligation accompanied by the obligee's incantation of a 'reservation of rights' against the secondary obligor could result in the principal obligor's liability to the secondary obligor based on the underlying obligation's original terms."). Because of the unfairness to principal debtors, some courts have not only required that the release indicate that the creditor's rights were reserved against the surety, but also that the surety's rights were reserved against the debtor. *See, e.g., Gholson v. Savin,* 137 Ohio St. 551, 31 N.E.2d 858, 863 (1941) ("In fairness and honesty, the reservation agreement should in terms reserve not only the creditor's right against the surety, but the surety's right against the principal as well.").[6]

To be sure, *Gholson* is not the majority rule. *See Hendershot v. Charleston Nat'l Bank,* 563 N.E.2d 546, 548 n. 2 (Ind.1990). Nevertheless, it is often cited as a leading criticism of the majority rule. *See* 74 Am.Jur.2d *Suretyship* § 99, at 73 n. 15; Stearns, *supra,* § 6.42, at 175 n. 27. Nor has Maryland adopted the *Gholson* rule; although the case was favorably cited by the Court of Appeals in *Noma Electric,* it was not cited for the proposition stated above. *See Noma Electric,* 201 Md. at 412, 94 A.2d 277. Nevertheless, as we observed earlier, in order to avoid the discharge of the surety when the principal is released, Maryland has long required an

---

**6.** We note that *Gholson* was decided before the adoption of the *Restatement of Security* in 1941.

express provision in a release indicating that the rights of the creditor are reserved against the surety. *See, e.g., Shriver,* 155 Md. at 64, 141 A. 434; *Clagett,* 5 G. & J. at 355–56.

In this case, the Release executed by Chicago, Executive, Academy, and Therrien does not provide for a reservation of rights by Chicago to pursue Lumbermen's. Moreover, the terms of the release indicate that it is absolute.[7] It states, in relevant part, as follows:

> Further, Chicago Title, on behalf of itself and its related persons, hereby releases, acquits and forever discharges Academy Title and Therrien and their respective predecessors and successors in business and interest, past, present and future parent corporations, subsidiaries, affiliates, assigns, liquidators, administrators, executors, shareholders, officers, directors, employees, attorneys, agents, and all persons claiming through them . . . from any and all claims, counterclaims, demands, payments, rights, obligations, loss, judgments, awards, attorneys fees, costs, fees, interest, damages, claims, liabilities or causes of action of whatever kind or character that it has asserted or might have asserted, whether known or unknown, and whether based upon statute, common law, regulations, or any other source of legal authority of any type, in connection with, arising out of, or in any way relating to any acts, circumstances, facts, omissions or other subject matters involved, embraced within, arising out of, relating to or otherwise touching upon the Chicago Title Action; the facts and circumstances giving rise to the Chicago Title Action. . . .

We are persuaded that, to preserve Chicago's claims against Lumbermen's, the Release should have expressly reserved the

---

7. Given the broad scope of the terms of the Release, we question whether the Release would have operated as a mere covenant not to sue, even if Chicago had attempted to reserve its rights against Lumbermen's. *See* Stearns, *supra,* § 6.42, at 175 n. 26 ("But the rule [construing a release with a reservation of rights as a covenant not to sue] will not be applied, and the surety will be discharged, where the release is absolute in form, even though it makes an attempt to reserve rights against the surety.").

creditor's rights against the surety. Because Chicago did not expressly reserve its rights to pursue Lumbermen's, it would seem unfair to allow Chicago to pursue Lumbermen's, which, in turn, would be able to pursue Academy and Therrien for indemnity, even though they had been fully released by Chicago. Although appellant argues that a construction of the Release resulting in a finding of discharge of the surety is bad policy, because it would discourage settlements, we believe just the opposite. In our view, such a result would encourage *informed* settlements and would prevent creditors from sandbagging unsophisticated debtors.

In reaching our conclusion, it is also significant to us that the action against Lumbermen's is derivative of Chicago's rights against Academy and Therrien. *Anne Arundel Medical Center, Inc. v. Condon,* 102 Md.App. 408, 649 A.2d 1189 (1994), *cert. dismissed,* 339 Md. 641, 664 A.2d 885 (1995), which involved vicarious liability for tort actions, provides a useful analogy. In that case, a patient sued the medical center, a pathologist, and the corporation for which the pathologist had worked as an independent contractor, for misinterpreting a biopsy specimen that later turned out to be cancerous. Both the corporation and the medical center moved for summary judgment on the ground that the pathologist was an independent contractor. The trial court granted the motion as to the corporation, but denied it as to the medical center. The pathologist died before trial, and, on the eve of trial, the patient agreed to a settlement with the pathologist's estate. As part of the settlement, the patient signed a release which expressly stated that it was not intended in any way to affect any claim that the patient had against the medical center or any other entity, except to provide a credit *pro tanto* as to other tortfeasors in relation to the patient's claim as a whole. *Id.* at 413 n. 2, 649 A.2d 1189.

After the release was executed, the medical center moved for summary judgment on the ground that its liability, being derivative in nature, released it from suit as a matter of law. The trial court denied the motion. On appeal, we reversed. In doing so, we reviewed Maryland's version of the Uniform

Contribution Among Tort-feasor's Act ("UCATA"), Md.Code (1957), Art. 50, §§ 16–24, and explained the distinction between joint tortfeasors and those whose liability is solely vicarious:

"Vicarious liability is based on a relationship between the parties, irrespective of participation, either by act or omission, of the one vicariously liable, under which it has been determined as a matter of policy that one person should be liable for the act of the other. Its true basis is largely one of public or social policy under which it has been determined that, irrespective of fault, a party should be held to respond for the acts of another.

More bluntly stated, '[i]n hard fact, the reason for the employer's liability is the damages are taken from a deep pocket.' The principal, having committed no tortious act, is not a 'tortfeasor' as the term is commonly defined."

*Id.* at 416–17, 649 A.2d 1189 (alterations omitted) (quoting *Theophelis v. Lansing Gen. Hosp.*, 430 Mich. 473, 424 N.W.2d 478, 482–83 (1988) (citations omitted)). The Court continued:

Joint liability, by way of contrast, is based on the concept that all joint (or concurrent) tortfeasors are actually independently at fault for their own wrongful acts. It is because of their independent wrongdoing that under [the UCATA provision stating that a release to one joint tortfeasor does not discharge the other tortfeasors unless the release so states], a plaintiff is permitted to bring an action against one joint tortfeasor after having released another joint tortfeasor from liability. Each tortfeasor faces liability for his or her own wrongdoing.

*Id.* at 417, 649 A.2d 1189 (citation omitted).

Thus, we held that the release acted to discharge the medical center because its liability was derivative of the pathologist's liability. Concluding that logic compelled such a result, we said:

The release of an agent removes the only basis for imputing liability to the principal. To hold otherwise would undermine the stated purpose underlying UCATA of promoting

settlements among joint tortfeasors. It is unlikely that an agent would ever settle with a plaintiff if he still remained liable to indemnify his principal for any further amount the principal might be compelled to pay to the plaintiff. The reluctance of an agent to settle in such an event would be consistent with [the UCATA provision] which states that this section "does not impair any right of indemnity" under Maryland's version of UCATA.

If a plaintiff, under such a hypothetical legal scheme, were able to find an agent willing to settle, to allow the plaintiff then to proceed additionally against a vicariously liable principal would, in essence, permit the plaintiff "two bites out of the apple." If the principal could then seek indemnity from the agent, the agent's earlier settlement would be of little solace to him. Such a double exposure would act as a disincentive for agents ever to agree to a settlement.

*Id.* at 421–22, 649 A.2d 1189 (citations and quotations omitted).

The case *sub judice* exemplifies the problem described both in *Condon* and the authorities that have recognized the reservation of rights doctrine. Here, the release failed expressly to reserve the creditor's rights to pursue the surety. Because Chicago's release did not expressly provide that Chicago had reserved its rights to pursue Lumbermen's, we hold that Chicago's release of Academy and Therrien discharged Lumbermen's obligations under the bond. To hold otherwise would allow an unscrupulous creditor to attack the debtor indirectly through the surety, notwithstanding the creditor's apparent agreement with the debtor to do otherwise.

In reaching our conclusion, we are unpersuaded by the argument that neither the agents nor Lumbermen's was prejudiced, because Academy and Therrien were fully aware of their indemnity agreement with Lumbermen's, by which they agreed to indemnify Lumbermen's against all loss that it might incur as a result of the bond. Regardless of the indemnity agreement, Chicago released Academy and Therrien. Yet without expressly stating that Chicago was reserv-

ing its rights against Lumbermen's, or without stating that Lumbermen's rights were preserved against Academy and Therrien, the Release appeared to discharge the insureds from any further liability, even as to Lumbermen's. If Chicago meant to preserve its rights as to Lumbermen's, thereby keeping the agents at risk, Chicago easily could have made that disclosure known in the Release, and should have done so.

 We also agree with the trial court that, under the *Restatement (Third)* § 39(c)(i), even if Lumbermen's were not discharged, it had no liability here. The *Restatement (Third)*, which is relatively new, supersedes the *Restatement of Security,* which was published in 1941. *See Restatement (Third)* at IX. It also alters the reservation of rights doctrine and the extent of a surety's exposure in the event that the creditor and obligor have entered into a release. It states:

> To the extent that the obligee releases the principal obligor from its duties pursuant to the underlying obligation:
>
> (a) the principal obligor is also discharged from any corresponding duties of performance and reimbursement owed to the secondary obligor unless the terms of the release effect a preservation of the secondary obligor's recourse (§ 38); [8]
>
> (b) the secondary obligor is discharged from any unperformed duties pursuant to the secondary obligation unless:
>
> (i) the terms of the release effect a preservation of the secondary obligor's recourse (§ 38); or
>
> (ii) the language or circumstances of the release otherwise show the obligee's intent to retain its claim against the secondary obligor;
>
> (c) if the secondary obligor is not discharged from its unperformed duties pursuant to the secondary obligation by

---

**8.** Section 38 essentially adopts the rule established in *Gholson,* 31 N.E.2d at 863, regarding the effect of the release on the obligor's liability to the secondary obligor.

operation of paragraph (b), the secondary obligor is discharged from those duties to the extent:

(i) of the value of the consideration for the release;

(ii) that the release of a duty to pay money pursuant to the underlying obligation would otherwise cause the secondary obligor a loss; and

(iii) that the release discharges a duty of the principal obligor other than the payment of money....

If we were to apply this provision to the case *sub judice*, Lumbermen's would not be completely discharged as a result of the Release, because it is undisputed that the "circumstances of the release otherwise show [Chicago's] intent to retain its claim against [Lumbermen's]." *Restatement (Third)* § 39(b)(ii). Thus, we would consider the extent of Lumbermen's discharge.

The *Restatement (Third)* also changes another rule that prevailed under the *Restatement of Security*. Under the *Restatement of Security*, a compensated surety was fully discharged if the creditor and principal obligor took any act that materially increased the secondary obligor's right of recourse. If the act did not cause a "material" increase of the secondary obligor's rights, however, the secondary obligor was discharged only to the extent of the prejudice. *See id.* § 128–129; Cohen, *supra*, at 1038–39. Maryland appears to have adopted this view. *See A/C Elec. Co. v. Aetna Ins. Co.*, 251 Md. 410, 418–20, 247 A.2d 708 (1968); *Prodis v. Constantinides*, 167 Md. 33, 37, 172 A. 286 (1934); *Fidelity Deposit Co. of Maryland v. Olney Assocs. Inc.*, 72 Md.App. 367, 371 n. 2, 530 A.2d 1 (1987); *see also Rosenbloom v. Feiler*, 290 Md. 598, 611, 431 A.2d 102 (1981); *Whalen v. Devlin Lumber & Supply Corp.*, 251 Md. 51, 53, 246 A.2d 247 (1968); *Republic Ins. Co. v. Prince George's County*, 92 Md.App. 528, 536, 608 A.2d 1301 (1992), *cert. dismissed*, 329 Md. 349, 619 A.2d 553 (1993). The question of whether the act worked a prejudice on the rights of the surety is a question of fact to be determined by the fact finder. *A/C Electric*, 251 Md. at 420, 247 A.2d 708. Thus, if the Release in this case did not discharge Lumbermen's, and if

we were to apply the prevailing rule under the *Restatement of Security,* the question of whether Lumbermen's was fully discharged would not be appropriate for summary judgment. Nevertheless, the trial court did not apply that rule; instead, the trial court applied the rule of the *Restatement (Third)* § 39(c).

Under § 39(c)(i), Lumbermen's would be discharged to the extent "of the value of the consideration for the release." In this case, Lumbermen's maximum liability was $100,000.00, as that was the amount of its bond. The trial court concluded that, because Executive paid Chicago $100,000.00 to effect the release, Lumbermen's was discharged to the full extent of its bond obligation, notwithstanding the characterization of the sum as payment for attorney's fees. We agree with the trial court.

We recognize that appellant claims that the $100,000.00 received from Executive, which had filed a declaratory action against Chicago, Therrien, and Academy in federal court, was in payment for Chicago's attorney's fees, and not for the damages claimed against Lumbermen's. Moreover, we recognize that appellant contends it had lost more than $100,000.00 as a result of Academy's and Therrien's actions. Nevertheless, what we said in *Kramer,* 64 Md.App. at 40, 494 A.2d 225, albeit in a slightly different context, is relevant here:

> If we were to accept [appellant's] argument, then double recovery would hinge upon the skill of the person drafting the release. If the release attributed nothing to the underlying indebtedness, the debt would still be recoverable in addition to the amount of the settlement. Neither case law nor fundamental fairness supports such a theory.

As we see it, attributing Executive's entire $100,000.00 payment to attorney's fees, and attributing nothing to the indebtedness of Academy and Therrien, can only be seen as a patent attempt to maximize Chicago's recovery from Lumbermen's.

Further, we note that Executive's obligations flowed directly from its contractual relationship with Academy and Therrien as their Errors and Omissions carrier. As the agent for

Academy and Therrien, Executive's payment can only be viewed as being made on behalf of its principals—Academy and Therrien. Executive's payment was directly associated with Academy's and Therrien's alleged misappropriation of escrow funds that gave rise to Chicago's suit against Academy, Therrien, and Lumbermen's. Regardless of how Chicago has characterized the consideration received for releasing Academy, Therrien, and Executive, the fact remains that Chicago has recovered $100,000.00, which is an amount equal to the maximum amount that could be due under Lumbermen's bond. Therefore, under *Restatement (Third)* § 39(c)(i), Lumbermen's has no liability to Chicago.

 Appellant also complains that Academy and Therrien were improperly permitted to argue before the trial court in connection with appellee's motion for summary judgment. Appellant argues that Academy and Therrien had no standing below and have no standing on appeal, because they had been dismissed as parties. With regard to the trial court's decision to permit Academy and Therrien, through counsel, to address the trial court, we perceive neither error nor an abuse of discretion. Further, even if there were error, it surely was harmless.

We note that Academy and Therrien were properly present at the hearing because the trial court also heard argument on their motion to strike Lumbermen's cross-claim against Academy and Therrien for indemnification, in the event that Chicago could pursue Lumbermen's. The trial court stated that it would permit counsel for Academy and Therrien to speak as a friend of the court with regard to Lumbermen's motion for summary judgment against Chicago. In addressing the trial court, counsel for Academy and Therrien merely brought legal authority to the court's attention. Under these circumstances, the court neither erred nor abused its discretion.

 Finally, we point out that Lumbermen's asserts that Chicago is not entitled to recovery under the bond because Chicago is not a "person" entitled to protection under Md. Code (1957, 1994 Repl.Vol.), Art. 48A, § 168A(f). Because we

hold that the Release operated to discharge Lumbermen's, we need not resolve this contention. Moreover, we ordinarily will not affirm summary judgment on a ground upon which the trial court did not rely. Md. Rule 8–131(a); *see Blades v. Woods,* 338 Md. 475, 478, 659 A.2d 872 (1995); *see also Gross v. Sussex Inc.,* 332 Md. 247, 254 n. 3, 630 A.2d 1156 (1993); *Hartford Accident and Indem. Co. v. Scarlett Harbor Assocs. Ltd. Partnership,* 109 Md.App. 217, 241 n. 7, 674 A.2d 106 (1996), *aff'd,* 346 Md. 122, 695 A.2d 153 (1997); *Hoffman v. United Iron and Metal Co.,* 108 Md.App. 117, 132–33, 671 A.2d 55 (1996). Therefore, we shall not consider appellee's claim.

**JUDGMENT AFFIRMED.**

**APPELLANT TO PAY COSTS.**